It is further ordered that petition for writ of habeas corpus will be and is hereby denied.

**Dorothy GAUTREAUX et al., Plaintiffs,**
**v.**
**George W. ROMNEY, Defendant.**
**No. 66 C 1460.**

United States District Court,
N. D. Illinois, E. D.

Oct. 1, 1971.

————◆————

Alexander Polikoff, Chicago, Ill., for plaintiffs.

J. C. Murray, Asst. U. S. Atty., Chicago, Ill., for defendant Romney.

Patrick W. O'Brien, Chicago, Ill., for intervening defendant Chicago Housing Authority.

Earl L. Neal, Chicago, Ill., for intervening defendant City of Chicago.

H. Ernest LaFontant, Chicago, Ill., for intervening defendant Central Advisory Council.

## MEMORANDUM OPINION

AUSTIN, District Judge.

It is particularly appropriate and fortuitous that this opinion is being handed down today, during the period that the Mayor has proclaimed as Model Cities Week. It is appropriate because it pinpoints who will be responsible for either the continuance or the discontinuance of the Model Cities Program in the City of Chicago.

In order to put in proper focus and perspective the problem confronting the court, the petition for an injunction, the hearing of last week, and the order to be entered today, the court feels it necessary to outline the historical background of this matter.

In 1966 the plaintiffs filed two different suits, one against Chicago Housing Authority and the other against the Secretary of Housing and Urban Development. Preparation for trial, by means of discovery, commenced first in the suit against Chicago Housing Authority. Documents from the files of Chicago Housing Authority and sworn testimony from the lips of present and former Chicago Housing Authority supervisory personnel revealed overwhelming and irrefutable evidence of twenty years of deliberate housing segregation on the part of Chicago Housing Authority. That was found to be the fact by this court in its decree of July, 1969, twenty-six months ago. After frantically consulting all the legal talent available to it, Chicago Housing Authority apparently determined that an appeal of this decree would be hopeless and abandoned it. The net effect of this was to permit the decree to stand unchallenged and thus become the law of the Northern District of Illinois.

At this point the court wishes to interpolate a new facet. Twenty-one days ago, it was judicially determined by the 7th Circuit Court of Appeals, 448 F.2d 731, that the Department of Housing and Urban Development was equally guilty and responsible with Chicago Housing Authority for deliberately perpetuating segregated housing. Relevant excerpts from that opinion follow:

"HUD's approval and funding of segregated CHA housing sites cannot be excused as an attempted accommodation of an admittedly urgent need for housing with the reality of community and City Council resistance.

\*      \*      \*      \*      \*      \*

"The fact that a governmental agency might have made 'numerous and consistent efforts' toward desegregation has not yet been held to negate liability for an otherwise segregated result.

\* \* \* \* \* \*

"It also is not seriously disputed on appeal that the Secretary exercised the above described powers in a manner which perpetuated a racially discriminatory housing system in Chicago, and that the Secretary and other HUD officials were aware of that fact.

\* \* \* \* \* \*

"On such facts, and given the inapplicability of HUD's 'good faith' arguments, we are unable to avoid the conclusion that the Secretary's past actions constituted racially discriminatory conduct in their own right.

\* \* \* \* \* \*

"We hold that HUD, through its Secretary, violated the Due Process Clause of the Fifth Amendment \* \* and also has violated Section 601 of the Civil Rights Act of 1964 \* \* \* "

Getting back to the July, 1969 decree, the next problem was the manner in which the illegal conduct that the court found could be remedied and ameliorated. Chicago Housing Authority was ordered to use its "best efforts" to supply and submit as rapidly as possible to the City Council for approval sites for seventeen hundred and forty-six units of public housing. The first seven hundred of these were to be in the general or white areas, and of the balance of one thousand and forty-six, seven hundred and fifty were also to be in the general or white areas of the City. The court and the plaintiffs waited patiently to determine what the "best efforts" of Chicago Housing Authority would produce. Ten months later these "best efforts" had not resulted in any sites being presented to the City Council for approval.

Conferences were held from time to time between attorneys for the plaintiffs and Chicago Housing Authority and its counsel, and at one of these in the spring of 1970, the Chairman of Chicago Housing Authority advised the plaintiffs that they would submit no sites to the City Council until after the municipal elections, one year later in the spring of 1971. The court was informed of this statement and also that the "best efforts" of Chicago Housing Authority had resulted in no submissions to the City Council. It thus became apparent that the court could no longer rely on the "best efforts" of Chicago Housing Authority and a new decree was signed on July 1, 1970, which established a timetable as to when these sites were to be submitted. This decree Chicago Housing Authority decided to appeal, hoping that the appellate procedure would delay the performance of the timetable until after the municipal elections in the spring of 1971.

They went screaming and protesting, as they had a legal right to do, first to the Court of Appeals, and that Court sustained the July, 1970 decree, Guatreaux v. Chicago Housing Authority, 7 Cir., 436 F.2d 306. Next, they went to the United States Supreme Court seeking to reverse the Court of Appeals, 7 Cir., 448 F.2d 731 and the highest Court in the land denied them the relief sought. 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661. One final effort was made to the United States Supreme Court for a rehearing, seeking to have that Court reverse itself, which was denied. Having run the gamut, they returned to the District Court where prompt disclosure and submission was ordered. Only then did Chicago Housing Authority, with a gun to its head, comply, twenty months after the first decree and eight months after the second decree. Sites for seventeen hundred odd units were finally disgorged and submitted to the City Council for its approval.

After the municipal elections, the City sought from the Secretary of the Department of Housing and Urban Development 26 million dollars to finance its Model Cities Program for the period from June 15 to December 31, 1971. It is obvious from the evidence that the Regional Administrator for the Department of Housing and Urban Development was concerned with the City's failure to perform many of its past commitments, including prompt submission to the City Council of the sites heretofore supplied

by Chicago Housing Authority. He apparently required the City to supply him with a Letter of Intent as to what its future conduct would be before authorizing and granting the 26 million dollar request. Such a Letter of Intent was drafted and redrafted and resulted in the Letter of Intent of May 12, 1971, setting forth the undertakings of the City. One of the witnesses in the case, Lewis Hill, the City's Commissioner of Development and Planning, testified that he participated in the drafting and redrafting of this Letter of Intent. Below are pertinent excerpts from the Letter of Intent:

"The following is an outline of the proposed action program and a timetable for its accomplishment.

"PART I. UNDERTAKINGS BY THE CITY AND THE CHA

"The following actions are to be implemented within the times hereinafter set forth.

\*     \*     \*     \*     \*     \*

"It is anticipated, however, that sites suitable for use by Chicago Housing Authority in accord with applicable law will be identified and processed by the City to permit acquisition by CHA to commence in accordance with the following schedule:

"Sites for 500 units by June 15, 1971;

Sites for 350 units by September 15, 1971;

Sites for 850 units by December 15, 1971."

This Letter of Intent was signed by the Mayor of the City of Chicago, the Chairman of Chicago Housing Authority and was dispatched to the Regional Administrator of the Department of Housing and Urban Development, who subsequently approved it.

It is obvious from the evidence in this case that the drafters and the signers of the Letter of Intent knew, or should have known, the improbability of compliance with the undertakings outlined above. It is becoming increasingly clear that there was no intention by each of the above parties to comply with their undertakings. The court finds that the sole purpose of the letter was to induce the Department of Housing and Urban Development to grant the 26 million dollars for funding the Model Cities Program.

By the first deadline, June 15, 1971, only two hundred forty-two units had been approved in the general or white areas. From June 15 to the next date deadline, only forty-six units were approved in the general or white areas, leaving a deficit of more than five hundred twenty-five units for approval.

On June 21, 1971, the Regional Administrator of the Department of Housing and Urban Development addressed a letter to the Mayor containing the following pertinent excerpts:

"As soon as the City has completed approval of sites 'suitable for use by the Chicago Housing Authority in accord with applicable law' for the 500 units of low-income family housing and has made major progress in the Leasing and Rent Certificate Program, HUD will issue a Letter of Consent for selected activities under the Second Year Neighborhood Development Program (the total Second Year NDP being $20,000,000).

"The Model Cities funds are being released on the condition that the City Council will continue to approve public housing sites 'suitable for use by Chicago Housing Authority in accord with applicable law' at each regular Council session and that the other City Agencies and Chicago Housing Authority will continue to show progress toward meeting the housing goals set forth in the Letter of Intention. Should this progress not continue the Model Cities Letter of Credit will be cancelled."

It is apparent that the planned release of the Model Cities funds was conditional. It is also perfectly clear that the conditions set forth have not been met, and it is becoming obvious that they never will be.

The court agrees that failure to continue the Model Cities Program for the next three months would have a devastating effect on tens of thousands of the citizens of this City. Four thousand would lose their jobs and many other thousands would be deprived of the benefits derived from the Model Cities Program. Only the City of Chicago, by failing to comply with its undertakings, and neither the plaintiffs nor this court, would be responsible for such a catastrophe. The court wonders, at this stage, whether the Regional Administrator of the Department of Housing and Urban Development, and a former Mayor of the City of St. Paul, really believe now that the City intends to comply with its undertakings. The evidence is to the contrary.

There have been occasions in the past, in other parts of this country, when chief executives have stood at the school house and the state house doors with their faces livid and their wattles flapping, and have defied the federal government to enforce its laws and decrees. It is an anomaly that the "law and order" chief executive of this City should challenge and defy the federal law. Apparently, "law and order" applies only to the enforcement of state law and municipal ordinances.

The defendant and the intervenors have appealed to the court's sense of equity in determining the matter before it. The court accedes to their request. The court will give the chief executive and his City Council an opportunity to repent and reconsider their conduct. The court will sugarcoat the pill. In order for the City to qualify for the 26 million dollar grant, the court will not require at this time that they approve fourteen hundred fifty units in the general or white areas, which they undertook to supply; the court will require merely approval for their current deficit as of September 15, 1971, those seven hundred such units, less than half of their total undertaking. This in no way relieves the City of the balance of its undertaking, spelled out in the letter of May 12. The court is handing them the key to the funds that they so plaintively seek; however, until that minimum compliance has been achieved, the court is enjoining the Department of Housing and Urban Development from releasing any of the funds but is authorizing it to do so when that minimum requirement has been met. Should the City fail to do so, the court has pinpointed the responsibility for the devastating effect which may ensue.

The court finds it has jurisdiction both under Rule 62(c) and the opinion of the 7th Circuit heretofore referred to.