# HILLS, SECRETARY OF HOUSING AND URBAN DEVELOPMENT *v.* GAUTREAUX ET AL.

No. 74–1047.   Argued January 20, 1976—Decided April 20, 1976

STEWART, J., delivered the opinion of the Court in which all Members joined, except STEVENS, J., who took no part in the consideration or decision of the case. MARSHALL, J., filed a concurring statement, in which BRENNAN and WHITE, JJ., joined, *post,* p. 306.

*Solicitor General Bork* argued the cause for petitioner. With him on the brief were *Assistant Attorney General Lee, Deputy Solicitor General Jones, Harriet S. Shapiro, William Kanter,* and *Anthony J. Steinmeyer.*

*Alexander Polikoff* argued the cause for respondents. With him on the brief were *Milton I. Shadur, Bernard Weisberg, Merrill A. Freed,* and *Robert J. Vollen.*

---

*James M. P. D'Amico* filed a brief for the city of Joliet, Ill., as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Martin E. Sloane* and *Arthur D. Wolf* for the National Committee Against Discrimination in Housing, Inc.; and by *Howard A. Glickstein, William L. Taylor,* and *Richard F. Bellman* for the Notre Dame Center for Civil Rights et al.

Briefs of *amici curiae* were filed by *J. Harold Flannery, Paul R. Dimond, William E. Caldwell, Norman J. Chachkin,* and *Nathaniel R. Jones* for the Lawyers' Committee for Civil Rights Under Law et al.; and by *Stephen J. Pollak, Richard M. Sharp,* and *David Rubin* for the National Education Association.

MR. JUSTICE STEWART delivered the opinion of the Court.

The United States Department of Housing and Urban Development (HUD) has been judicially found to have violated the Fifth Amendment and the Civil Rights Act of 1964 in connection with the selection of sites for public housing in the city of Chicago. The issue before us is whether the remedial order of the federal trial court may extend beyond Chicago's territorial boundaries.

## I

This extended litigation began in 1966 when the respondents, six Negro tenants in or applicants for public housing in Chicago, brought separate actions on behalf of themselves and all other Negro tenants and applicants similarly situated against the Chicago Housing Authority (CHA) and HUD.[1] The complaint filed against CHA in the United States District Court for the Northern District of Illinois alleged that between 1950 and 1965 substantially all of the sites for family public housing selected by CHA and approved by the Chicago City Council were "at the time of such selection, and are now," located "within the areas known as the Negro Ghetto." The respondents further alleged that CHA deliberately selected the sites to "avoid the placement of Negro families in white neighborhoods" in violation of federal statutes and the Fourteenth Amendment. In a companion suit against HUD the respondents claimed that it had "assisted in the carrying on and continues to assist in the carrying on of a racially discriminatory public housing system within the City of Chicago" by providing

---

[1] The original complaint named the Housing Assistance Administration, then a corporate agency of HUD, as the defendant. Although the petitioner in this case is the current Secretary of HUD, this opinion uses the terms "petitioner" and "HUD" interchangeably.

financial assistance and other support for CHA's discriminatory housing projects.[2]

The District Court stayed the action against HUD pending resolution of the CHA suit.[3]  In February 1969, the court entered summary judgment against CHA on the ground that it had violated the respondents' constitutional rights by selecting public housing sites and assigning tenants on the basis of race.[4]  *Gautreaux* v. *Chicago Housing Authority*, 296 F. Supp. 907.  Uncon-

---

[2] The complaint sought to enjoin HUD from providing funds for 17 projects that had been proposed by CHA in 1965 and 1966 and from making available to CHA any other financial assistance to be used in connection with the racially discriminatory aspects of the Chicago public housing system.  In addition, the respondents requested that they be granted "such other and further relief as the Court may deem just and equitable."

[3] Before the stay of the action against HUD, the District Court had certified the plaintiff class in the CHA action and had rejected CHA's motion to dismiss or for summary judgment on the counts of the complaint alleging that CHA had intentionally selected public housing sites to avoid desegregating housing patterns.  265 F. Supp. 582.

[4] CHA admitted that it had followed a policy of informally clearing proposed family public housing sites with the alderman in whose ward the proposed site was located and of eliminating each site opposed by the alderman.  296 F. Supp. 907, 910, 913.  This procedure had resulted in the rejection of 99½% of the units proposed for sites in white areas which had been initially selected as suitable for public housing by CHA.  *Id.*, at 912.

With regard to tenant assignments, the court found that CHA had established a racial quota to restrict the number of Negro families residing in the four CHA family public housing projects located in white areas in Chicago.  The projects, all built prior to 1944, had Negro tenant populations of 7%, 6%, 4%, and 1% despite the fact that Negroes composed about 90% of the tenants of CHA family housing units and a similar percentage of the waiting list. A  CHA  official  testified  that  until  1968  the  four  projects located in white areas were listed on the Authority's tenant-selection form as suitable for white families only.  *Id.*, at 909.

tradicted evidence submitted to the District Court established that the public housing system operated by CHA was racially segregated, with four overwhelmingly white projects located in white neighborhoods and with 99½% of the remaining family units located in Negro neighborhoods and 99% of those units occupied by Negro tenants. *Id.*, at 910.[5] In order to prohibit future violations and to remedy the effects of past unconstitutional practices, the court directed CHA to build its next 700 family units in predominantly white areas of Chicago and thereafter to locate at least 75% of its new family public housing in predominantly white areas inside Chicago or in Cook County. *Gautreaux* v. *Chicago Housing Authority*, 304 F. Supp. 736, 738–739.[6] In addition, CHA was ordered to modify its tenant-assignment and site-selection procedures and to use its best efforts to increase the supply of dwelling units as rapidly as possible in conformity with the judgment. *Id.*, at 739–741.

---

[5] In July 1968, CHA had in operation or development 54 family housing projects with a total of 30,848 units. Statistics submitted to the District Court established that, aside from the four overwhelmingly white projects discussed in n. 4, *supra*, 92% of all of CHA's family housing units were located in neighborhoods that were at least 75% Negro and that two-thirds of the units were situated in areas with more than 95% Negro residents. *Id.*, at 910.

[6] The District Court's remedial decree divided Cook County into a "General Public Housing Area" and a "Limited Public Housing Area." The "Limited Public Housing Area" consisted of the area within census tracts having a 30% or more nonwhite population or within one mile of the boundary of any such census tract. The remainder of Cook County was included in the "General Public Housing Area." 304 F. Supp., at 737. Following the commencement of construction of at least 700 family units in the General Public Housing Area of the city of Chicago, CHA was permitted by the terms of the order to locate up to one-third of its General Public Housing Area units in the portion of Cook County outside of Chicago. See *id.*, at 738–739.

The District Court then turned to the action against HUD. In September 1970, it granted HUD's motion to dismiss the complaint for lack of jurisdiction and failure to state a claim on which relief could be granted. The United States Court of Appeals for the Seventh Circuit reversed and ordered the District Court to enter summary judgment for the respondents, holding that HUD had violated both the Fifth Amendment and § 601 of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d, by knowingly sanctioning and assisting CHA's racially discriminatory public housing program. *Gautreaux* v. *Romney,* 448 F. 2d 731, 739–740.[7]

On remand, the trial court addressed the difficult problem of providing an effective remedy for the racially segregated public housing system that had been created by the unconstitutional conduct of CHA and HUD.[8]

---

[7] The Court of Appeals found that "HUD retained a large amount of discretion to approve or reject both site selection and tenant assignment procedures of the local housing authority" and that the Secretary had exercised those powers "in a manner which perpetuated a racially discriminatory housing system in Chicago." 448 F. 2d, at 739. Although the appellate court stated that it was "fully sympathetic" with the "very real 'dilemma'" presented by the need for public housing in Chicago, it ruled that the demand for housing did not justify "the Secretary's past actions [which] constituted racially discriminatory conduct in their own right." *Ibid.*

[8] The court's July 1969 order directing CHA to use its best efforts to increase public housing opportunities in white areas as rapidly as possible had not resulted in the submission of a single housing site to the Chicago City Council. A subsequent order directing the submission of sites for 1,500 units by September 20, 1970, had eventually prompted CHA to submit proposed sites in the spring of 1971, but inaction by the City Council had held up the approval of the sites required for their development. See *Gautreaux* v. *Romney,* 332 F. Supp. 366, 368.

The District Court subsequently took additional measures in an

The court granted the respondents' motion to consolidate the CHA and HUD cases and ordered the parties to formulate "a comprehensive plan to remedy the past effects of unconstitutional site selection procedures." The order directed the parties to "provide the Court with as broad a range of alternatives as seem . . . feasible" including "alternatives which are not confined in their scope to the geographic boundary of the City of Chicago." After consideration of the plans submitted by the parties and the evidence adduced in their support, the court denied the respondents' motion to consider metropolitan area relief and adopted the petitioner's

attempt to implement the remedial orders entered against CHA. In May 1971, the city of Chicago and HUD agreed to a letter of intent that provided that the city would process sites suitable for use by CHA to permit the Authority to commence acquisition of sites for 1,700 units in accordance with a specified timetable. HUD then released certain Model Cities funds on the condition that the City Council and CHA continue to show progress toward meeting the goals set forth in the May letter. After the city fell far behind schedule, the District Court granted the respondents' request for an injunction directing HUD to withhold $26 million in Model Cities funds until the city remedied its existing deficit under the timetable. See *id.*, at 368–370. The Court of Appeals reversed the injunction, holding that the District Court had abused its discretion in ordering funding cut off. 457 F. 2d 124.

Between July 1971 and April 1972, the City Council failed to conduct any hearings with respect to acquisition of property for housing sites and did not approve land acquisition for any sites. *Gautreaux* v. *Chicago Housing Authority*, 342 F. Supp. 827, 829. Following the filing of a supplemental complaint naming the mayor and the members of the City Council as defendants, the District Court found that their inaction had prevented CHA from providing relief in conformity with the court's prior orders. In a further effort to effectuate relief, the court ruled that the provision of Illinois law requiring City Council approval of land acquisition by CHA "shall not be applicable to CHA's actions . . . taken for the purpose of providing Dwelling Units." *Id.*, at 830. The Court of Appeals upheld this decision. *Gautreaux* v. *City of Chicago*, 480 F. 2d 210.

proposed order requiring HUD to use its best efforts to assist CHA in increasing the supply of dwelling units and enjoining HUD from funding family public housing programs in Chicago that were inconsistent with the previous judgment entered against CHA. The court found that metropolitan area relief was unwarranted because "the wrongs were committed within the limits of Chicago and solely against residents of the City" and there were no allegations that "CHA and HUD discriminated or fostered racial discrimination in the suburbs."

On appeal, the Court of Appeals for the Seventh Circuit, with one judge dissenting, reversed and remanded the case for "the adoption of a comprehensive metropolitan area plan that will not only disestablish the segregated public housing system in the City of Chicago . . . but will increase the supply of dwelling units as rapidly as possible." 503 F. 2d 930, 939. Shortly before the Court of Appeals announced its decision, this Court in *Milliken* v. *Bradley*, 418 U. S. 717, had reversed a judgment of the Court of Appeals for the Sixth Circuit that had approved a plan requiring the consolidation of 54 school districts in the Detroit metropolitan area to remedy racial discrimination in the operation of the Detroit public schools. Understanding *Milliken* "to hold that the relief sought there would be an impractical and unreasonable overresponse to a violation limited to one school district," the Court of Appeals concluded that the *Milliken* decision did not bar a remedy extending beyond the limits of Chicago in the present case because of the equitable and administrative distinctions between a metropolitan public housing plan and the consolidation of numerous local school districts. 503 F. 2d, at 935–936. In addition, the appellate court found that, in contrast to *Milliken*, there was evidence of suburban discrimination and

of the likelihood that there had been an "extra-city impact" of the petitioner's "intra-city discrimination." *Id.*, at 936–937, 939–940. The appellate court's determination that a remedy extending beyond the city limits was both "necessary and equitable" rested in part on the agreement of the parties and the expert witnesses that "the metropolitan area is a single relevant locality for low rent housing purposes and that a city-only remedy will not work." *Id.*, at 936–937. HUD subsequently sought review in this Court of the permissibility in light of *Milliken* of "inter-district relief for discrimination in public housing in the absence of a finding of an inter-district violation."[9] We granted certiorari to consider this important question. 421 U. S. 962.

## II

In *Milliken* v. *Bradley, supra,* this Court considered the proper scope of a federal court's equity decree in the context of a school desegregation case. The respondents in that case had brought an action alleging that the Detroit public school system was segregated on the basis of race as the result of official conduct and sought an order establishing " 'a unitary, nonracial school system.' " 418 U. S., at 723. After finding that constitutional violations committed by the Detroit School Board and state officials had contributed to racial segregation in the Detroit schools, the trial court had proceeded to the formulation of a remedy. Although there had been neither proof of unconstitutional actions on the part of neighboring school districts nor a demonstration that the Detroit violations had produced significant segregative effects in those districts, the court established

---

[9] Although CHA participated in the proceeding before the Court of Appeals, it did not seek review of that court's decision and has not participated in the proceedings in this Court.

a desegregation panel and ordered it to prepare a remedial plan consolidating the Detroit school system and 53 independent suburban school districts. *Id.*, at 733–734.[10] The Court of Appeals for the Sixth Circuit affirmed the desegregation order on the ground that, in view of the racial composition of the Detroit school system, the only feasible remedy required "the crossing of the boundary lines between the Detroit School District and adjacent or nearby school districts." 484 F. 2d 215, 249. This Court reversed the Court of Appeals, holding that the multidistrict remedy contemplated by the desegregation order was an erroneous exercise of the equitable authority of the federal courts.

Although the *Milliken* opinion discussed the many practical problems that would be encountered in the consolidation of numerous school districts by judicial decree, the Court's decision rejecting the metropolitan area desegregation order was actually based on fundamental limitations on the remedial powers of the federal courts to restructure the operation of local and state governmental entities. That power is not plenary. It "may be exercised 'only on the basis of a constitutional violation.'" 418 U. S., at 738, quoting *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 16. See *Rizzo* v. *Goode*, 423 U. S. 362, 377. Once a constitutional violation is found, a federal court is required to

---

[10] Although the trial court's desegregation order in *Milliken* did not direct the adoption of a specific metropolitan area plan, it did contain detailed guidelines for the panel appointed to draft the desegregation plan. 345 F. Supp. 914 (ED Mich.). The framework for the plan called for the division of the designated 54-school-district desegregation area into 15 clusters, each containing a part of the Detroit school system and two or more suburban districts. Within this framework, the court charged the panel with the responsibility for devising a plan that would produce the maximum actual desegregation. *Id.*, at 918, 928–929. See 418 U. S., at 733–734.

tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." 418 U. S., at 744; *Swann, supra,* at 16. In *Milliken,* there was no finding of unconstitutional action on the part of the suburban school officials and no demonstration that the violations committed in the operation of the Detroit school system had had any significant segregative effects in the suburbs. See 418 U. S., at 745, 748. The desegregation order in *Milliken* requiring the consolidation of local school districts in the Detroit metropolitan area thus constituted direct federal judicial interference with local governmental entities without the necessary predicate of a constitutional violation by those entities or of the identification within them of any significant segregative effects resulting from the Detroit school officials' unconstitutional conduct. Under these circumstances, the Court held that the interdistrict decree was impermissible because it was not commensurate with the constitutional violation to be repaired.

Since the *Milliken* decision was based on basic limitations on the exercise of the equity power of the federal courts and not on a balancing of particular considerations presented by school desegregation cases, it is apparent that the Court of Appeals erred in finding *Milliken* inapplicable on that ground to this public housing case.[11]

___

[11] The Court of Appeals interpreted the *Milliken* opinion as limited to a determination that, in view of the administrative complexities of school district consolidation and the deeply rooted tradition of local control of public schools, the balance of equitable factors weighed against metropolitan area school desegregation remedies. See 503 F. 2d, at 935–936. But the Court's decision in *Milliken* was premised on a controlling principle governing the permissible scope of federal judicial power, a principle not limited to a school desegregation context. See 418 U. S., at 744.

In addition, the Court of Appeals surmised that either an interdistrict violation or an interdistrict segregative effect may have been present in this case. There is no support provided for either con-

The school desegregation context of the *Milliken* case is nonetheless important to an understanding of its discussion of the limitations on the exercise of federal judicial power. As the Court noted, school district lines cannot be "casually ignored or treated as a mere administrative convenience" because they separate independent governmental entities responsible for the operation of autono-

clusion. The sole basis of the appellate court's discussion of alleged suburban discrimination was the respondents' Exhibit 11 illustrating the location of 12 public housing projects within the portion of the Chicago Urbanized Area outside the city limits of Chicago. That exhibit showed that 11 of the 12 projects were located in areas that, at the time of the hearing in November 1972, were within one mile of the boundary of a census tract with less than a 70% white population. The exhibit was offered to illustrate the scarcity of integrated public housing opportunities for the plaintiff class and for lower income white families and to indicate why the respondents did not "expect cooperation from the suburban areas" in providing housing alternatives in predominately white areas. In discussing the data underlying the exhibit, counsel for the respondents in the trial court expressly attempted to avoid the "possible misconception" that he was then asserting that the suburban municipalities and housing authorities were "guilty of any discrimination or wrongdoing." In view of the purpose for which the exhibit was offered and the District Court's determination that "the wrongs were committed within the limits of Chicago," it is apparent that the Court of Appeals was mistaken in supposing that the exhibit constitutes evidence of suburban discrimination justifying metropolitan area relief.

In its brief opinion on rehearing, the Court of Appeals asserted that "it is reasonable to conclude from the record" that the intra-city violation "may well have fostered racial paranoia and encouraged the 'white flight' phenomenon which has exacerbated the problems of achieving integration." 503 F. 2d, at 939–940. The Court of Appeals' speculation about the effects of the discriminatory site selection in Chicago is contrary both to expert testimony in the record and the conclusions of the District Court. Such unsupported speculation falls far short of the demonstration of a "significant segregative effect in another district" discussed in the *Milliken* opinion. See 418 U. S., at 745.

mous public school systems. 418 U. S., at 741–743. The Court's holding that there had to be an interdistrict violation or effect before a federal court could order the crossing of district boundary lines reflected the substantive impact of a consolidation remedy on separate and independent school districts.[12] The District Court's desegregation order in *Milliken* was held to be an impermissible remedy not because it envisioned relief against a wrongdoer extending beyond the city in which the violation occurred but because it contemplated a judicial decree restructuring the operation of local governmental entities that were not implicated in any constitutional violation.

### III

The question presented in this case concerns only the authority of the District Court to order HUD to take remedial action outside the city limits of Chicago. HUD does not dispute the Court of Appeals' determination that it violated the Fifth Amendment and § 601 of the Civil Rights Act of 1964 by knowingly funding CHA's racially discriminatory family public housing program, nor does it question the appropriateness of a remedial order designed to alleviate the effects of past segregative practices by requiring that public housing be developed in areas that will afford respondents an opportunity to reside in desegregated neighborhoods. But HUD contends that the *Milliken* decision bars a remedy affecting

---

[12] The Court in *Milliken* required either a showing of an interdistrict violation or a significant segregative effect "[b]efore the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes." *Id.*, at 744. In its *amicus* memorandum in *Milliken,* the United States argued that an interdistrict remedy in that case would require "the restructuring of state or local government entities" and result in "judicial interference with state prerogatives concerning the organization of local governments."

its conduct beyond the boundaries of Chicago for two reasons. First, it asserts that such a remedial order would constitute the grant of relief incommensurate with the constitutional violation to be repaired. And, second, it claims that a decree regulating HUD's conduct beyond Chicago's boundaries would inevitably have the effect of "consolidat[ing] for remedial purposes" governmental units not implicated in HUD's and CHA's violations. We address each of these arguments in turn.

## A

We reject the contention that, since HUD's constitutional and statutory violations were committed in Chicago, *Milliken* precludes an order against HUD that will affect its conduct in the greater metropolitan area. The critical distinction between HUD and the suburban school districts in *Milliken* is that HUD has been found to have violated the Constitution. That violation provided the necessary predicate for the entry of a remedial order against HUD and, indeed, imposed a duty on the District Court to grant appropriate relief. See 418 U. S., at 744. Our prior decisions counsel that in the event of a constitutional violation "all reasonable methods be available to formulate an effective remedy," *North Carolina State Board of Education* v. *Swann*, 402 U. S. 43, 46, and that every effort should be made by a federal court to employ those methods "to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation." *Davis* v. *School Comm'rs of Mobile County*, 402 U. S. 33, 37. As the Court observed in *Swann* v. *Charlotte-Mecklenburg Board of Education:* "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." 402 U. S., at 15.

Nothing in the *Milliken* decision suggests a *per se* rule that federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred.[13]   As we noted in Part II, *supra,* the District Court's proposed remedy in *Milliken* was impermissible because of the limits on the federal judicial power to interfere with the operation of state political entities that were not implicated in unconstitutional conduct.   Here, unlike the desegregation remedy found erroneous in *Milliken,* a judicial order directing relief beyond the boundary lines of Chicago will not necessarily entail coercion of uninvolved governmental units, because both CHA and HUD have the authority to operate outside the Chicago city limits.[14]

---

[13] Although the State of Michigan had been found to have committed constitutional violations contributing to racial segregation in the Detroit schools, 418 U. S., at 734–735, n. 16, the Court in *Milliken* concluded that the interdistrict order was a wrongful exercise of judicial power because prior cases had established that such violations are to be dealt with in terms of "an established geographic and administrative school system," *id.,* at 746, and because the State's educational structure vested substantial independent control over school affairs in the local school districts.   See *id.,* at 742–744.   In *Milliken,* a consolidation order directed against the State would of necessity have abrogated the rights and powers of the suburban school districts under Michigan law.   See *id.,* at 742 n. 20.   Here, by contrast, a metropolitan area remedy involving HUD need not displace the rights and powers accorded suburban governmental entities under federal or state law.   See Part III–B, *infra.*

[14] Illinois statutes permit a city housing authority to exercise its powers within an "area of operation" defined to include the territorial boundary of the city and all of the area within three miles beyond the city boundary that is not located within the boundaries of another city, village, or incorporated town.   In addition, the housing authority may act outside its area of operation by contract with another housing authority or with a state public body

In this case, it is entirely appropriate and consistent with *Milliken* to order CHA and HUD to attempt to create housing alternatives for the respondents in the Chicago suburbs. Here the wrong committed by HUD confined the respondents to segregated public housing. The relevant geographic area for purposes of the respondents' housing options is the Chicago housing market, not the Chicago city limits. That HUD recognizes this reality is evident in its administration of federal housing assistance programs through "housing market areas" encompassing "the geographic area 'within which all dwelling units . . .' are in competition with one another as alternatives for the users of housing." Department of Housing and Urban Development, FHA Techniques of Housing Market Analysis 8 (Jan. 1970), quoting the Institute for Urban Land Use and Housing Studies, Housing Market Analysis: A Study of Theory and Methods, c. 2 (1953). The housing market area "usually extends beyond the city limits" and in the larger markets "may extend into several adjoining counties." FHA Techniques of Housing Market Analysis, *supra,* at 12.[15] An order against HUD and CHA regulating their conduct in the greater metropolitan area will

---

not within the area of operation of another housing authority. Ill. Rev. Stat. c. 67½, §§ 17 (b), 27c (1973).

Although the state officials in *Milliken* had the authority to operate across school district lines, the exercise of that authority to effectuate the court's desegregation order would have eliminated numerous independent school districts or at least have displaced important powers granted those uninvolved governmental entities under state law. See n. 13, *supra.*

[15] In principal markets such as Chicago, the Standard Metropolitan Statistical Area is coterminous with the housing market area. See Department of Housing and Urban Development, FHA Techniques of Housing Market Analysis 13 (Jan. 1970); Department of Housing and Urban Development, Urban Housing Market Analysis 5 (1966).

do no more than take into account HUD's expert determination of the area relevant to the respondents' housing opportunities and will thus be wholly commensurate with the "nature and extent of the constitutional violation." 418 U. S., at 744. To foreclose such relief solely because HUD's constitutional violation took place within the city limits of Chicago would transform *Milliken*'s principled limitation on the exercise of federal judicial authority into an arbitrary and mechanical shield for those found to have engaged in unconstitutional conduct.

## B

The more substantial question under *Milliken* is whether an order against HUD affecting its conduct beyond Chicago's boundaries would impermissibly interfere with local governments and suburban housing authorities that have not been implicated in HUD's unconstitutional conduct. In examining this issue, it is important to note that the Court of Appeals' decision did not endorse or even discuss "any specific metropolitan plan" but instead left the formulation of the remedial plan to the District Court on remand. 503 F. 2d, at 936. On rehearing, the Court of Appeals characterized its remand order as one calling "for additional evidence and for further consideration of the issue of metropolitan area relief in light of this opinion and that of the Supreme Court in Milliken v. Bradley." *Id.*, at 940. In the current posture of the case, HUD's contention that any remand for consideration of a metropolitan area order would be impermissible as a matter of law must necessarily be based on its claim at oral argument "that court-ordered metropolitan relief in this case, no matter how gently it's gone about, no matter how it's framed, is bound to require HUD to ignore the safeguards of local autonomy and local political processes" and therefore to violate the limitations on federal judicial power

established in *Milliken*. In addressing this contention we are not called upon, in other words, to evaluate the validity of any specific order, since no such order has yet been formulated.

HUD's position, we think, underestimates the ability of a federal court to formulate a decree that will grant the respondents the constitutional relief to which they may be entitled without overstepping the limits of judicial power established in the *Milliken* case. HUD's discretion regarding the selection of housing proposals to assist with funding as well as its authority under a recent statute to contract for low-income housing directly with private owners and developers can clearly be directed toward providing relief to the respondents in the greater Chicago metropolitan area without preempting the power of local governments by undercutting the role of those governments in the federal housing assistance scheme.

An order directing HUD to use its discretion under the various federal housing programs to foster projects located in white areas of the Chicago housing market would be consistent with and supportive of well-established federal housing policy.[16] Title VI of the Civil Rights Act of 1964 prohibits racial discrimination in federally assisted programs including, of course, public housing programs.[17] Based upon this statutory prohibition, HUD in 1967 issued site-approval rules for low-rent

---

[16] In the District Court, HUD filed an appendix detailing the various federal programs designed to secure better housing opportunities for low-income families and represented that "the Department will continue to use its best efforts in review and approval of housing programs for Chicago which address the needs of low income families."

[17] It was this statutory prohibition that HUD was held to have violated by its funding of CHA's housing projects. See 448 F. 2d, at 740.

housing designed to avoid racial segregation and expand the opportunities of minority group members "to locate outside areas of [minority] concentration." Department of Housing and Urban Development, Low-Rent Housing Manual, § 205.1, ¶ 4g (Feb. 1967 rev.). Title VIII of the Civil Rights Act of 1968 expressly directed the Secretary of HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further" the Act's fair housing policy. 82 Stat. 85, 42 U. S. C. § 3608 (d)(5).

Among the steps taken by HUD to discharge its statutory duty to promote fair housing was the adoption of project-selection criteria for use in "eliminating clearly unacceptable proposals and assigning priorities in funding to assure that the best proposals are funded first." HUD Evaluation of Rent Supplement Projects and Low-Rent Housing Assistance Applications, 37 Fed. Reg. 203 (1972). In structuring the minority housing opportunity component of the project-selection criteria, HUD attempted "to assure that building in minority areas goes forward only after there truly exist housing opportunities for minorities elsewhere" in the housing market and to avoid encouraging projects located in substantially racially mixed areas. *Id.*, at 204. See 24 CFR § 200.710 (1975). See generally Maxwell, HUD's Project Selection Criteria—A Cure for "Impermissible Color Blindness"?, 48 Notre Dame Law. 92 (1972).[18] More recently, in

---

[18] A HUD study of the implementation of the project-selection criteria revealed that the actual operation of the minority housing opportunity criterion depends on the definition of "area of minority concentration" and "racially mixed" area employed by each field office. The meaning of those terms, which are not defined in the applicable regulations, 24 CFR § 200.710 (1975), varied among field offices and within the jurisdiction of particular field offices. Department of Housing and Urban Development, Implementation of HUD Project Selection Criteria for Subsidized Housing: An Evaluation 116–117 (Dec. 1972).

the Housing and Community Development Act of 1974, Congress emphasized the importance of locating housing so as to promote greater choice of housing opportunities and to avoid undue concentrations of lower income persons. See 88 Stat. 633, 42 U. S. C. §§ 5301 (c) (6), 5304 (a) (4) (A), (C) (ii) (1970 ed., Supp. IV); H. R. Rep. No. 93–1114, p. 8 (1974).

A remedial plan designed to insure that HUD will utilize its funding and administrative powers in a manner consistent with affording relief to the respondents need not abrogate the role of local governmental units in the federal housing-assistance programs. Under the major housing programs in existence at the time the District Court entered its remedial order pertaining to HUD, local housing authorities and municipal governments had to make application for funds or approve the use of funds in the locality before HUD could make housing-assistance money available. See 42 U. S. C. §§ 1415 (7) (b), 1421b (a) (2). An order directed solely to HUD would not force unwilling localities to apply for assistance under these programs but would merely reinforce the regulations guiding HUD's determination of which of the locally authorized projects to assist with federal funds.

The Housing and Community Development Act of 1974, amending the United States Housing Act of 1937, 88 Stat. 653, 42 U. S. C. § 1437 et seq. (1970 ed., Supp. IV), significantly enlarged HUD's role in the creation of housing opportunities. Under the § 8 Lower-Income Housing Assistance program, which has largely replaced the older federal low-income housing programs,[19] HUD

---

[19] In fiscal year 1975, new contract commitments under the § 8 program were approximately $10.7 billion, as compared to total estimated new contract commitments of approximately $16.35 billion for all federally subsidized housing programs. The comparable figures for fiscal year 1976 indicate that $22.725 billion of a total

may contract directly with private owners to make leased housing units available to eligible lower income persons.[20] As HUD has acknowledged in this case, "local governmental approval is no longer explicitly required as a condition of the program's applicability to a locality." Brief for Petitioner 33–34. Regulations governing the § 8 program permit HUD to select "the geographic area or areas in which the housing is to be constructed," 24 CFR § 880.203 (b) (1975), and direct that sites be chosen to "promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." §§ 880.112 (d), 883.209 (a)(3). See §§ 880.112 (b), (c), 883.209 (a)(2), (b)(2). In most cases the Act grants the unit of local government in which the assistance is to be provided the right to comment on the application and, in certain specified circumstances, to preclude the Secretary of HUD from approving the application. See 42 U. S. C. §§ 1439 (a)–(c) (1970 ed., Supp. IV).[21]

---

of $24.8 billion in new contract commitments are to be made under the § 8 program. See Hearings on Department of Housing and Urban Development—Independent Agencies Appropriations for 1976, before a Subcommittee of the House Committee on Appropriations, 94th Cong., 1st Sess., pt. 5, pp. 85–86 (1975). See also *id.*, at 119 (testimony of HUD Secretary Hills).

[20] Under the § 8 program, HUD contracts to make payments to local public housing agencies or to private owners of housing units to make up the difference between a fair market rent for the area and the amount contributed by the low-income tenant. The eligible tenant family pays between 15% and 25% of its gross income for rent. See 42 U. S. C. § 1437f (1970 ed., Supp. IV).

[21] If the local unit of government in which the proposed assistance is to be provided does not have an approved housing-assistance plan, the Secretary of HUD is directed by statute to give the local governmental entity 30 days to comment on the proposal, after which time the Secretary may approve the project unless he determines that there is not a need for the assistance. 42 U. S. C. § 1439 (c) (1970 ed., Supp. IV). In areas covered by an approved

Use of the § 8 program to expand low-income housing opportunities outside areas of minority concentration would not have a coercive effect on suburban municipalities. For under the program, the local governmental units retain the right to comment on specific assistance proposals, to reject certain proposals that are inconsistent with their approved housing-assistance plans, and to require that zoning and other land-use restrictions be adhered to by builders.

In sum, there is no basis for the petitioner's claim that court-ordered metropolitan area relief in this case would be impermissible as a matter of law under the *Milliken* decision. In contrast to the desegregation order in that case, a metropolitan area relief order directed to HUD would not consolidate or in any way restructure local

plan, the local governmental entity is afforded a 30-day period in which to object to the project on the ground that it is inconsistent with the municipality's approved housing-assistance plan. If such an objection is filed, the Secretary may nonetheless approve the application if he determines that the proposal is consistent with the housing-assistance plan. § 1439 (a). The local comment and objection procedures do not apply to applications for assistance involving 12 or fewer units in a single project or development. § 1439 (b).

The ability of local governments to block proposed § 8 projects thus depends on the size of the proposed project and the provisions of the approved housing-assistance plans. Under the 1974 Act, the housing-assistance plan must assess the needs of lower income persons residing in or expected to reside in the community and must indicate the general locations of proposed housing for lower income persons selected in accordance with the statutory objective of "promoting greater choice of housing opportunities and avoiding undue concentrations of assisted persons." 42 U. S. C. §§ 5304 (a) (4) (A), (C) (ii) (1970 ed., Supp. IV). See H. R. Rep. No. 93–1114, p. 8 (1974). See also *City of Hartford* v. *Hills,* 408 F. Supp. 889 (Conn. 1976). In view of these requirements of the Act, the location of subsidized housing in predominantly white areas of suburban municipalities may well be consistent with the communities' housing-assistance plans.

governmental units. The remedial decree would neither force suburban governments to submit public housing proposals to HUD nor displace the rights and powers accorded local government entities under federal or state housing statutes or existing land-use laws. The order would have the same effect on the suburban governments as a discretionary decision by HUD to use its statutory powers to provide the respondents with alternatives to the racially segregated Chicago public housing system created by CHA and HUD.

Since we conclude that a metropolitan area remedy in this case is not impermissible as a matter of law, we affirm the judgment of the Court of Appeals remanding the case to the District Court "for additional evidence and for further consideration of the issue of metropolitan area relief." 503 F. 2d, at 940. Our determination that the District Court has the authority to direct HUD to engage in remedial efforts in the metropolitan area outside the city limits of Chicago should not be interpreted as requiring a metropolitan area order. The nature and scope of the remedial decree to be entered on remand is a matter for the District Court in the exercise of its equitable discretion, after affording the parties an opportunity to present their views.

The judgment of the Court of Appeals remanding this case to the District Court is affirmed, but further proceedings in the District Court are to be consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE WHITE join, concurring.

I dissented in *Milliken* v. *Bradley,* 418 U. S. 717

(1974), and I continue to believe that the Court's decision in that case unduly limited the federal courts' broad equitable power to provide effective remedies for official segregation. In this case the Court distinguishes *Milliken* and paves the way for a remedial decree directing the Department of Housing and Urban Development to utilize its full statutory power to foster housing projects in white areas of the greater Chicago metropolitan area. I join the Court's opinion except insofar as it appears to reaffirm the decision in *Milliken*.