Robert W. KELLEY, et al.

v.

**METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE, et al.,**

v.

**STATE OF TENNESSEE; Lamar Alexander, Governor of the State of Tennessee; Robert L. McElrath, Commissioner of Education; and State Board of Education.**

Nos. 2094, 2956.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 14, 1985.

Avon N. Williams, Jr., Richard H. Dinkins, Williams & Dinkins, Nashville, James M. Nabrit, III, Theodore M. Shaw, Bill Lann Lee, New York City, for plaintiffs Robert W. Kelley, et al.

William R. Willis, Jr., Marian F. Harrison, Willis & Knight, Nashville, Tenn., for defendants Metro, et al.

R. Stephen Doughty, Deputy Atty. Gen., Stephen Nunn, Asst. Atty. Gen., Nashville, Tenn., for defendants State of Tenn., et al.

## MEMORANDUM

WISEMAN, Chief Judge.

The City of Nashville and surrounding Davidson County have struggled with desegregation since 1956. Social and political turmoil created by the issue have made the process particularly arduous—and in recent years expensive. Between 1971 and 1982, Metropolitan Nashville and Davidson County [Metro] spent approximately $20,000,000 to desegregate its public schools, with an estimated annual recurring cost (as of 1982) of $6,000,000.

Until today, Metro Nashville has gone it alone. The State of Tennessee has viewed desegregation strictly as a local matter. The Court now rules that State officials

shall be enjoined from further refusing to carry out their affirmative, continuing duty to eliminate the vestiges of segregation which Tennessee's own constitution, statutes, policies and practices created and maintained during the last one hundred years. Pursuant to the injunction, the Court orders the State to assume sixty percent (60%) of the costs of the desegregation program in Metropolitan Nashville and Davidson County.

The Court grants the motion for partial summary judgment of third party plaintiff Metropolitan County Board of Education of Nashville and Davidson County. Fed.R. Civ.P. 56.

### Jurisdiction

■■■ The Court proceeds under 28 U.S.C. § 1343 and 2201 to adjudicate issues arising under the Civil Rights Acts, 42 U.S.C. § 1983 and 1985. The Eleventh Amendment does not bar the action since third party plaintiffs seek to enjoin state officials from refusing to conform their conduct to well established constitutional standards. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court is vested with legal authority to decide the merits of the claims against these officials and to issue such ancillary orders as equity deems necessary to enforce the injunction. *Bradley v. Milliken,* 540 F.2d 229, 245–46 (6th Cir.1976), *aff'd,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

### Facts

This case has proceeded before this Court since 1956. The facts are long and detailed. For purposes of the current issue, the Court confines its consideration to the conduct of state and county officials in carrying out the mandate of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), which ordered the end of state-imposed segregation and directed states to desegregate public schools "with all deliberate speed."[1]

1. A more detailed review of the history of this case appears in an earlier opinion by this Court.

The issue presented is whether the undisputed facts demonstrate that the State of Tennessee is a "constitutional wrongdoer" culpable for the continuing effects of state-imposed segregation and is therefore subject to an injunction and ancillary order directing the State to share in the costs of desegregating Metro schools.

The Thirteenth, Fourteenth and Fifteenth Amendments represent the end of a century of slavery throughout the South. Despite Congress' enactment of the Civil Rights Acts, 42 U.S.C. § 1981, *et seq.,* to protect blacks against unfair treatment by state officials and to assure them the rights and privileges guaranteed to all persons within the United States, enforcement of the *Jim Crow* laws through the mid-1960's diminished the rights of blacks, segregating them from other American citizens and limiting their opportunities to obtain quality education, housing, and medical care.

In 1954 the Supreme Court, recognizing the inequitable position of the nation's minorities, declared an end to the "separate, but equal" policies practiced by many states. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In 1955, Chief Justice Warren, speaking for the Court in *Brown v. Board of Education,* 349 U.S. 294, 299–301, 75 S.Ct. 753, 755–756, 99 L.Ed. 1083 (1955) (Brown II), directed school authorities to devise and implement policies to assure the admission of all students to public schools on racially nondiscriminatory bases at the earliest practicable date.

The *Brown* decision had an immediate impact in Tennessee. At the time *Brown* was decided, the Tennessee Constitution mandated separation of the races in public schools. Article XI § 12 provided in relevant part:

> No school established or aided under this section shall allow white and negro children to be received as scholars in the same school.

*See Kelley v. Board of Education,* 492 F.Supp. 167 (M.D.Tenn.1980).

The Tennessee Supreme Court struck down the provision as unconstitutional in 1956. *Roy v. Brittain*, 201 Tenn. 140, 297 S.W.2d 72 (1956). The State of Tennessee held four constitutional conventions between 1959 and 1978. Despite the *Brittain* Court's ruling, the provision was not removed from Tennessee's official books until the fourth convention in 1978.

The *Brown II* directive created great apprehension throughout many communities. Local school boards were particularly concerned about their responsibility to desegregate schools. In response to numerous requests for advice and direction, Attorney General George McCanless issued an opinion letter defining the State's legal responsibility in implementing the *Brown II* mandate and that of the local school boards. The June 16, 1955, letter states:

> Under the Code of Tennessee the management of the public schools is solely the business of the local school boards. These boards, within the limits of applicable law, determine all of the local school problems. This has been the law since the origin of the public school system in Tennessee and is the law today. Under this state of the law it is the responsibility of each local school board to determine for itself the way in which it is going to meet the problem of desegregating the schools under its jurisdiction.

> Each board must determine for itself, in light of all existing applicable circumstances, (physical, fiscal, sociological, transportation problems, etc.) when, where, how and to what degree, the schools under its jurisdiction are to be desegregated. This imposes upon each board the duty of considering for itself its own course of action.

> Local school boards which are sued by negroes seeking admission to schools under their jurisdiction must be prepared to defend their own action determining the manner in which their schools shall be desegregated. It will be necessary for legal counsel for defense of such suit to be provided by the county, the city, or special school district involved. While

> the office of the Attorney General is aware of the problems that will confront the school boards and is sympathetic with their problems, the office can do no more than to advise with representatives of the boards with respect to these problems as they arise. Under the Constitution and the statutes of Tennessee, the office of the Attorney General is limited to representation of the state and of state officials with respect to state revenue and other state matters. Counties, cities, and special districts have always been required by law to provide their own legal counsel in matters affecting them, and this has not been changed because of the desegregation opinion; however, within the limits of our ability and to the extent permitted by the most favorable interpretation of the statutes defining and regulating our duties, we stand ready to furnish such advice and guidance as under the circumstances we can.·

> While, as indicated above, the State Department of Education has no legal responsibility to determine the manner in which the segregation problem will be dealt with in each school district, there is much the Department can do by way of correlation of information and other things which will occur to you as the responsible head of that Department. As a result of conferences with you I know that you intend to have the Department of Education do all that it can within the framework of existing law to assist local school boards in the solution of their heavy and vexing problems.

The McCanless opinion letter established the State's policy to keep out the politics of desegregation, leaving local communities to grapple with the issue. The State asserts in its brief that the McCanless letter represents the State of Tennessee's policy on desegregation which continues today. Third Party Defendant's Motion for Summary Judgment, Memorandum at 7 (filed December 19, 1984).

The plaintiffs in this case filed their complaint on September 23, 1955. The State was not named as a defendant.

Despite General McCanless' 1955 statement that desegregation was purely a "local school problem," in January of 1957, the Tennessee legislature passed the parental preference statutes permitting "voluntary segregation" of the races in public schools. T.C.A. § 49–3704 (1957); *see* Transcript of Debate on House Bill 29 (1957), Exhibit D, Third Party Plaintiff's Motion for Summary Judgment (filed 12–19–84). In September of 1957, this Court struck down the parental preference statutes; the holding later was affirmed by the Sixth Circuit. *Kelley v. Board of Education,* 270 F.2d 209, 230 (6th Cir.), *cert. denied* 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959). Ignoring the ruling, in December of 1957, the Nashville School Board submitted a desegregation plan to this Court grounded on the parental preference statute and the principles of "voluntary desegregation." This Court disapproved of the plan.

In 1960, a separate suit was filed seeking the desegregation of Davidson County schools. Subsequently, in 1963, that suit was consolidated with the original Nashville desegregation suit.

In 1971, Judge Morton entered a comprehensive order directing the desegregation of Metro Nashville and Davidson County schools. *Kelley v. Board of Education,* Nos. 2094, 2956, at 6 (M.D.Tenn. June 28, 1971); *see also Kelley,* 492 F.Supp. 167 (M.D.Tenn.1980). The order constitutes a watershed event in this litigation, finding that the separation of races in the public schools was the result of a policy of de jure segregation. *See Kelley v. Board of Education,* 687 F.2d 814, 815–16 (6th Cir.1982). During 1971, this Court increasingly became concerned over Metro's "half hearted" efforts to devise and implement an effective program to desegregate its public schools. *See* 492 F.Supp. 167, 171. Ultimately, the Court found Metro to have failed to act in good faith. *See* 687 F.2d at 816.

While Metro dragged its feet, the State of Tennessee did nothing to facilitate the desegregation process. In 1972 the legislature passed a bill providing that if a local school board voluntarily adopted a transportation plan aimed at achieving racial balance, the governor was authorized to order the withholding of all state funds from the local school board. T.C.A. § 49–6–2101(f) (1983). This is the law today. During the early 1970's, State officials also adopted a number of anti-busing resolutions.

The State of Tennessee along with a number of State officials were joined as defendants in this case in 1981. Twenty-six years had elapsed since the filing of the original complaint, and ten years from Judge Morton's entry of the 1971 comprehensive order. The Metropolitan County Board of Education of Nashville and Davidson County, Tennessee now seek (1) an injunction prohibiting the State from continuing to refuse to participate in the desegregation process and (2) ancillary orders directing the State to provide funds to assist Metro in carrying on the desegregation plan ordered by this Court.

### Issues

The State asserts three principal propositions which they argue preclude issuance of the relief sought by the third party plaintiffs.

1. The State is not now and has not been a "constitutional wrongdoer." That is, the State claims that it has committed no post-*Brown* acts that have adversely affected desegregation in Nashville. Moreover, the State claims that the exercise of federal jurisdiction over Nashville and Davidson County schools has made State intervention into the local desegregation program inappropriate and, as such, has absolved the State of any affirmative duty that may have required them to participate in the elimination of vestiges of state-imposed segregation.

2. The Eleventh Amendment bars the award of retrospective or prospective relief against the state.

3. Plaintiffs are barred from relief by operation of both the statute of limitations to the equitable doctrines of laches and unclean hands.

### Discussion

A. *The State of Tennessee is Obliged to Eliminate the Vestiges of State-Imposed Segregation.*

The State of Tennessee asserts that it cannot be held responsible for the costs of desegregating Metro schools because, although admittedly a historical force imposing mandatory segregation, it has been innocent of any culpable conduct since the 1954 decision in *Brown.* The State argues that only upon a showing of "direct impact" of its policies or practices—either in maintaining segregation or in inhibiting the desegregation efforts—can the State be implicated and thereby held responsible for desegregating Nashville's schools.

■■■ This Court views the State's responsibility quite differently from the view adopted by state officials. A state is obliged to do more than merely abandon its prior discriminatory conduct. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (Dayton II). A state which initially creates a dual system of education for its citizens has a continuing, affirmative duty to eradicate all the lingering effects of its pro-segregation efforts. *Reed v. Rhodes,* 500 F.Supp. 404, 424 (N.D. Ohio 1980), *aff'd* 662 F.2d 1219 (6th Cir. 1981) *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *United States v. State of Missouri,* 363 F.Supp. 739, 747 (E.D.Mo.1973), *aff'd in relevant part,* 515 F.2d 1365 (8th Cir.1975), *cert. denied,* 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975); *Liddell v. Board of Education of City of St. Louis,* 491 F.Supp. 351, 359 (E.D.Mo.1980) 667 F.2d 643 (8th Cir.), *cert. denied* 454 U.S. 1081, 102 S.Ct. 634, 70 L.Ed.2d 614 (1981) (subsequent citation history omitted). Contrary to the position of the State, when it became necessary for this Court to step in and supervise the dismantling of the dual system, the pres-ence of the Court did not end the obligation of the State to participate in eliminating segregation—it merely limited the State's discretion in directing the overall process. The limitation did not release the State from its constitutional and statutory duty to end the discriminatory system it had created and maintained for a significant period of time and to take affirmative steps to remedy the debilitating effects that resulted from the system.

B. *The Eleventh Amendment Permits this Court Both to Enjoin Tennessee Officials from Refusing to Perform Their Constitutional Duties and to Issue Appropriate Ancillary Orders Aimed at Assuring Compliance.*

1. *The "Prospective Compliance" Exception to the Eleventh Amendment*

■■■ "The Eleventh Amendment does not prevent enforcement of the Fourteenth Amendment...." *United States v. Board of Education of the City of Indianapolis,* 503 F.2d 68, 82 (7th Cir.1974), *cert. denied* 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975); *Bradley v. Milliken,* 540 F.2d 229, 244 (6th Cir.1976), *aff'd* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). Federal courts are empowered to enjoin state officials from acting in a manner that violates federal constitutional or statutory law or from failing to carry out an affirmative duty imposed under federal constitutional or statutory provisions. *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. at 454. As discussed below, the undisputed facts presented before the Court establish as a matter of law that state officials have failed to carry out their affirmative legal obligation to eradicate the lingering effects of state-imposed segregation and are therefore liable for a continuing violation of the Fourteenth Amendment rights of the black citizens of Metropolitan Nashville and Davidson County. The Court deems it appropriate to issue an injunction enjoining state officials from further refusing to carry out their affirmative obligations and to issue such ancillary orders as are necessary to

ensure proper compliance with the injunctive relief ordered.

■■■ Well established principles of federal law recognize the authority of this Court to issue the ordered relief. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any foreign state.

The Amendment constitutionalizes the doctrine of sovereign immunity of the states, imposing a constitutional limitation on the federal judicial power established under Article III of the Constitution. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, ——, 104 S.Ct. 900, 906, 79 L.Ed.2d 67, 77 (1984). In the absence of a state's consent, federal courts may not entertain suits against a state or one of its agencies or departments, or against a state official when the state is the "real substantial party in interest." *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

■■■ Third party plaintiff's claims against the State of Tennessee would be lost but for the saving grace of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Young,* the Supreme Court recognized the "prospective-compliance" exception to the jurisdictional bar of the Eleventh Amendment, permitting federal courts to enjoin ongoing conduct by a state official that is in violation of federal law. The "fiction" of *Young* holds that a state may not authorize an unconstitutional action by its officers. Hence, for Eleventh Amendment purposes, a state official is stripped of his official status and subject to the consequences of his conduct when he acts in an unlawful manner. *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. at 454.[2]

### 2. Tennessee Officials Continue to Fail to Discharge the State's Duty to Assure the Desegregation of Metro Schools

The State of Tennessee argues that this Court lacks authority to order injunctive relief against the State because none of its officials currently is acting in violation of federal constitutional or statutory law. The State admits that although prior to *Brown* the State mandated strict separation of the races in public schools, presently no officials are acting in a matter to intentionally foster such segregation. The State argues further that the duty to desegregate schools and to eliminate the lingering effects of past discrimination is solely an issue of local county concern and, as such, the State has no present, affirmative duty to participate in Metro's desegregation program. The State relies on the recent decision in *Banas v. Dempsey,* 742 F.2d 277 (6th Cir.1984), *cert. granted, sub nom., Green v. Mansour,* —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 158 (1985), for the proposition that in the absence of ongoing unlawful conduct, federal district courts have no basis on which to issue an injunction since the requisite facts (warranting the *Young* prospective compliance exception to the jurisdictional bar of the Eleventh Amendment) are no longer present. *Id.* at 286–87.

■■■ *Banas* was a class action alleging that the State of Michigan wrongfully had denied certain AFDC recipients benefits by refusing to permit deductions appropriate under federal law. After the suit was filed, but before the district court ruled on the plaintiffs' motion for a preliminary injunction, Congress amended the Social Security Act, 42 U.S.C. § 602(a), with the result that Michigan's actions, though improper under former law, became legal. The *Banas* court held that the Eleventh Amendment barred the court from issuing

---

**2.** Justice Stephens speaks of the *Young* fiction as a "well-recognized irony" since an official's unlawful conduct constitutes "state action" under the Fourteenth Amendment but not "state action" under the Eleventh Amendment. *Florida Department of State v. Treasurer Salvors,* *Inc.,* 458 U.S. 670, 685, 102 S.Ct. 3304, 3315, 73 L.Ed.2d 1057 (1982) (Stephens, J., plurality opinion). *See also Banas v. Dempsey,* 742 F.2d 277, 284 n. 12 (6th Cir.1984), *cert. granted, sub nom., Green v. Mansour,* —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 158 (1985).

any order requiring notice of any possible past unlawful state conduct to the putative classes. Congress' amendment of the Social Security Act legitimized Michigan's actions, eliminating the possibility for prospective relief in the suit. As a result, the plaintiffs' claims were only for relief for past harm—and therefore barred. The Eleventh Amendment prohibits "the award of an accrued monetary liability" which represents "retroactive payments." *Edelman v. Jordan*, 415 U.S. 651, 663–64, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). That is, federal courts may only issue prospective relief against a State or its officials; principles of sovereign immunity preclude the award of relief for past wrongs. This Court finds that the undisputed facts demonstrate that State officials continue to deny their responsibility to participate in Metro's "local problem" of desegregation. For purposes of *Banas*, this refusal constitutes ongoing unlawful conduct—conduct which this Court has the power to enjoin. The Court is empowered to order the State to share in the prospective costs of desegregation; however, the Eleventh Amendment prohibits a retroactive award for costs already sustained by Metro. The order is made effective from March 16, 1981, the date on which the motion to implead third party defendants was filed.

a. *Public Education is Primarily a State Function; Therefore, Desegregation Requires the Formulation and Implementation of State Public Policy.*

Contrary to the opinion of Attorney General McCanless, segregation in county schools is not merely a local problem. Public education is a state function, involving a delegation to local officials the duty to administer the details of daily operations.

Since the inauguration of the present system of [Tennessee] public schools, in 1873, it has never been even suggested that the state and counties may have different systems and schools, the state operating a state school, and the county a county school, but the basic idea is that the county may supplement the state funds, so as to enlarge and improve the state schools.... We are of the opinion that the legislature ... may as well establish a uniform system of schools and a uniform administration of them, as it may establish a uniform system of criminal laws and of courts to execute them. The object of the criminal laws is, by punishment, to deter others from the commission of crimes, and thus preserve the peace, morals, good order, and well-being of society; and the object of the public-school system is to prevent crime, by educating the people, and thus, by providing and securing a higher state of intelligence and morals, conserve the peace, good order, and well-being of society. The prevention of crime, and preservation of good order and peace, is the highest exercise of the police power of the state, whether done by punishing offenders or educating the children.

\* \* \* \* \* \*

[T]he schools, in which are educated and trained children who are to become rulers of the commonwealth, are matters of state, and not local, jurisdiction; that in such matters the state is a unit, and the legislature a source of power; that the establishment and control of public schools is a function of the general assembly, both under the constitution and because it is a matter of state concern.... Power thus asserted is exercised in a manner which is not of common right, but which concerns institutions founded and fostered by the state. The regulation, in its entire scope, relates exclusively to the enjoyment of the privilege afforded a system of education created and maintained by the state for the general good, and it must follow that the state does have power to make the regulations effective by prescribing the method which shall be pursued by those who seek to enjoy the privilege it has created. Certainly, no one will deny the existence of such a right, and, if it does exist, it must reside in the law making power of the state.

*Leeper v. State,* 103 Tenn. 500, 53 S.W. 962 (1899) (upholding as constitutional the Ten-

nessee Uniform Textbook Act). The *Leeper* court's analysis of the state's authority over public schools is as valid today as when it was spoken at the turn of the century.

The Tennessee Constitution establishes the State's central role in public education. EDUCATION'S INHERENT VALUE—PUBLIC SCHOOLS—SUPPORT OF HIGHER EDUCATION. —The State of Tennessee recognizes the inherent value of education and encourages it support. *The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools.* The General Assembly may establish and support such post secondary educational institutions, including public institutions of higher learning, as it determines. (emphasis added). Tennessee Const. Art. XI, § 12 (amended March 31, 1978). Title 49 of the Tennessee Code addresses public education within the State of Tennessee. Its thirteen chapters illustrate the control state officials exert over local school matters. For example, the State regulates teacher compensation and advancement under the "master teacher" program; it approves the location of new school facilities, and frequently prescribes the curriculum offered in schools.

Counties do not operate their own, autonomous schools; rather, local districts operate state schools at the direction and for the benefit of the state, serving those children who reside within their jurisdictional boundaries. Matters which affect the educational milieu in a local school district are matters of state concern. Desegregation certainly is one such matter. General McCanless' opinion letter declaring the State shall stay out of the "local problem" of desegregation establishes a policy to delegate fully the State's responsibility to formulate and achieve a solution.

b. *The State Deliberately Has Refrained From Participating in the Desegregation of Public Schools.*

▆▆▆▆▆ The State has the nondelegable duty to participate in the desegregation of local schools. State officials have abdicated that duty. The violation continues today. Placing all consideration of the State's post-*Brown* conduct aside, this Court believes that State action prior to 1954—in mandating strict separation of the races in public schools—serves, in and of itself, as a sufficient basis on which to find the State responsible for eliminating the continuing effects of racial discrimination. The decision by Tennessee to cease its official discrimination against blacks in light of *Brown* did not eliminate the debilitating effects created by generations of segregation. The effects continue today. *Milliken v. Bradley*, 433 U.S. 267, 287–88, 97 S.Ct. 2749, 2760–61, 53 L.Ed.2d 745 (1977) ("[p]upil assignment does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by independent measures.").

There exist numerous post-*Brown* acts, however, that demonstrate the State's refusal to discharge its duty to participate in the desegregation of Metro schools. The Sixth Circuit Court of Appeals has set forth a five-part test for determining whether a state has intentionally supported a segregated school system. In *Penick v. Columbus Board of Education*, 583 F.2d 787, 818 (6th Cir.1978), *aff'd* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), the court remanded the case to the district court to make more detailed findings of fact concerning:

1. The State School Board's knowledge (if any) of the [local school board's] intentional segregative practices;

2. The State Board's failure to protest or restrain [the local board] by withholding funds,

3. The State Board's continuance of support in the face of such knowledge,

4. The motivation of the State Board in failing to investigate the reasons for de facto segregation, and

5. The effect of findings, if any, under 1, 2, 3 and 4.

Applying the *Penick* test to the undisputed facts presented by the parties the Court makes the following findings: following the original decision in *Brown,* the local boards looked to the State Department of Education for guidance, only to be rebuffed and cast adrift by Attorney General McCanless's letter of June 16, 1955. Faced with the Supreme Court mandate to desegregate its public schools, the State abdicated its responsibility, placing the onus upon each individual school district. Rather than coordinating, the State created chaos. General McCanless was correct in stating "[The local school boards], within the limits of applicable law, determine all of the local school problems." That is to say, the local school boards could do whatever they desired so long as their actions comported with state law on the subject. For example, a local school district currently faced with the "local problem" of segregated schools may voluntarily pursue a desegregation policy so long as the program does not "use or authorize the use of any school transportation facility for the purpose of achieving a racial balance ... in any school by requiring the transportation of any student or pupil from one school to another or from one school district ... to another." T.C.A. § 49–6–2101(f)(1). Statutory prohibition of the principal remedial approach to desegregation of public schools illustrates the State's involvement in the "local" issue of desegregation.

More fundamentally, however, this Court does not believe that state-imposed segregation is merely a "local school problem." Mandated by the Tennessee Constitution and regulated by Tennessee statutes, the dual system of public education was wholly a product of State-inspired segregation. General McCanless' opinion letter established the State's "hands off" policy. Yet, what the State characterizes as a federalism-based respect for the jurisdiction of the United States District Court, the Court views as a failure to discharge the affirmative responsibility to participate in devising and implementing an effective remedy. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961) ("[n]o State may abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be.").

Acknowledging the less than good faith efforts of Metro preceding the 1971 order, the Court nevertheless believes that the State's failure to assume a strong leadership role promoting desegregation has delayed the efficient implementation of desegregation plans throughout the State and has fueled the intransigent attitudes held by many local school boards. Although the Tennessee Supreme Court struck down the Tennessee constitutional provision mandating separation of the races in public schools in *Roy v. Brittain,* 201 Tenn. 140, 297 S.W.2d 72 (1956), the State maintained the provisions on its books until 1978. While the State had no authority to enforce the provisions, the continued publication may be construed as an official statement of State policy on the issue of desegregation. The 1957 parental preference statutes, the statutory prohibition on voluntary busing and the numerous official antibusing resolutions reaffirm the State's lack of commitment to eliminate the vestiges of discrimination in Tennessee.

The State was aware of the segregated conditions in Metro schools and of Metro's resistance throughout the 1960's to desegregation. The State did not protest nor threaten sanctions, but continued to fund Metro and to pass legislation consistent with Metro's obstructionist spirit. The State, like Metro, simply did not want to desegregate Metro schools through a busing remedy. Following a policy of abdication, the State has been free to set up as many hurdles as possible to disrupt those school districts either required by federal court order or voluntarily choosing to desegregate their schools.

The Court concludes that the State of Tennessee has failed to acknowledge its duty imposed under *Brown* and that State officials continue to refrain from discharging their constitutional obligation to participate in the elimination of the vestiges of state-imposed segregation. *See Lid-*

*dell v. Board of Education of City of St. Louis,* 491 F.Supp. at 359 ("[i]n sum, the State defendants stand before the Court as primary constitutional wrongdoers who have abdicated their affirmative remedial duty.").

3. *Federal Courts Frequently Have Applied the "Prospective Compliance" Exception to School Desegregation Cases and Have Ordered States to Share the Costs of Desegregation Plans.*

 "A state which initially compelled or authorized the creation of a local dual system has a continuing affirmative duty to eradicate all lingering effects on segregation; the neglect of that constitutional duty renders the state liable." *Reed v. Rhodes,* 500 F.Supp. 404, 424 (N.D.Ohio 1980), *aff'd* 662 F.2d 1219 (6th Cir.1981), *cert. denied* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). "[T]he primary responsibility for insuring a constitutional structure of public education is the state's, ... it is appropriate for the Court to order the State to affirmatively participate in remedial efforts ... including the provision of funding, to the extent necessary, for desegregation ordered by the Court. *Liddell v. Board of Education,* 491 F.Supp. at 360. In *Reed,* the Ohio State Attorney General and state statutes mandated that the state school board participate in the desegregation of local schools. The school board was found to have failed to do so and, in the light of its post-*Brown* conduct, was held to have violated the rights of the plaintiffs. The State was ordered to share in the costs of desegregation.

 This Court, having determined that State officials are in violation of federal law, has the power to enjoin the continuation of the conduct and to order the State to share in the desegregation costs.

[I]n the event of a constitutional violation all reasonable methods [are] available to formulate an effective remedy, "and that effort should be made by a federal court to employ those methods to achieve the greatest possible degree of relief, taking into account the practicalities of the situation.... Once a right and a violation

have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. *Hills v. Gautreaux,* 425 U.S. 284, 297, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976). Reviewing the operations of the state school board in *Penick v. Columbus Board of Education,* 663 F.2d 24, 26 (6th Cir. 1981), the Sixth Circuit Court of Appeals noted that unlike the other activities of the school board, the board operated under a "hands-off" policy with respect to school desegregation. The court found that the state had failed to exercise its power to facilitate the dismantling of the state-created segregated systems and that the "incremental effect of the State Board's action and inaction [was] the total failure of compliance with the constitution and laws of the United States and of Ohio in the performance of the duty to eliminate racial segregation in the Columbus school system." The circuit court affirmed the district court's order directing the state to share in the loss of desegregating Columbus schools. *See also United States v. Indianapolis Board of School Commissioners,* 677 F.2d 1185 (7th Cir.), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982) (ordering State to pay the entire cost of desegregating Indianapolis schools).

 While a state's failure to act, in and of itself, may be insufficient to support a finding of liability against a state, *see Reed v. Rhodes,* 500 F.Supp. at 423 (citing cases), the undisputed facts presented by the parties in this case support the finding that the creation and maintenance of the segregated school systems in Metro Nashville and Davidson County are the result, in part, of the intentional conduct of the state officials. *See Dayton Board of Education v. Brinkman,* 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977). The culpability of the State's inaction is compounded by its active campaign against busing. Such conduct has been counterproductive to the desegregation efforts of local administrators and parents.

The State's conduct in attempting to undermine the efforts of Metro Nashville and Davidson County is to be distinguished from those cases in which the state was held not liable for the segregated conditions in local schools. In *Alexander v. Youngstown Board of Education*, 454 F.Supp. 985, 1074 (N.D.Ohio 1978), *aff'd*, 675 F.2d 787 (6th Cir.1982), the court held that because the *local* school board was held not liable for intentionally segregating its schools, the state could not be liable. Ohio officials' failure to investigate and act on information concerning racial imbalances, while supporting the inference of intentional segregation, was held not to be a sufficient basis for liability in light of the state's other affirmative actions in attempting to secure the desegregation of the Youngstown schools. *Id.* Similarly, in *Arthur v. Nyquist*, 573 F.2d 134 (2d Cir.) *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978), the State of New York was held not liable for the segregated conditions in Buffalo schools. In that case, the Commissioner of the Board of Education issued a policy statement on desegregation directing local school districts to eliminate dual systems and threatening to withhold funds for those districts failing to comply. The commissioner's subsequent failure to withhold funds from recalcitrant school districts ultimately was held to be prudential in light of legitimate policy concerns over unduly disrupting schools. *Id.* at 146.

In comparison, in this case, the State did nothing constructive *ab initio*. The State had knowledge of the existence of racial imbalances in Metro schools and knew of Metro's failure to comply with this Court's orders to implement an effective desegregation remedy. Rather than assist this Court to aid Metro in dismantling its dual system, state officials passed antibusing resolutions, maintained segregation statutes and constitutional provisions on the books, and threatened to cut off funds to any school system voluntarily imposing busing to alleviate racial balances. In *Nyquist*, state officials were held not liable for failing to withhold state funds in light of their other affirmative efforts to promote desegregation. Here, state officials have no favorable light to reflect on their actions. No "legitimate policy considerations" justify the State's conduct.

■ The Eleventh Amendment does not bar this Court from enjoining state officials from continuing to refuse to discharge their duty to participate in the implementation of desegregation in Metro schools. To assure compliance with the injunction, the Court exercises its remedial authority to order State officials to assist Metro in meeting the costs of eliminating the invidious effects of past discrimination.

*C. The Statute of Limitations Does Not Bar Metro from Seeking an Injunction and Appropriate Orders Against the State of Tennessee and Its Officials.*

■ The Court holds that the statute of limitations does not bar the claims of Metropolitan Nashville and Davidson County for injunctive relief against the State of Tennessee because (1) the third party plaintiffs sue in their official governmental capacity seeking relief as an arm of the State for the general good of the population, and (2) the State is liable for a continuing violation of federal law thereby staying the operation of the statute of limitations period.

*1. The Claim Pursued by Metropolitan Nashville and Davidson County Involves Conduct in the Discharge of a Public Function Thereby Immunizing Third Party Plaintiffs from the Operation of the Relevant Statute of Limitations.*

■ "Nullum tempus occurritt regi," that is, the lapse of time does not operate to bar the right of the state to pursue its civil remedies. *Williams v. Cravens*, 31 Tenn.App. 246, 214 S.W.2d 57, 59 (Tenn. App.) *cert. denied* (Tenn.1948). In Tennessee, actions for compensatory and/or punitive damages brought under the federal civil rights statutes must be commenced within one year after the cause of action has accrued. T.C.A. § 28–3–104 (1980);

*Wilson v. Garcia,* —— U.S. ——, —— ——, 105 S.Ct. 1938, 1948–49, 85 L.Ed.2d 254, 268–69 (1985) (holding that the applicable statute of limitations for claims arising under the federal Civil Rights Act is to be determined by reference to the state statute of limitations for personal injury actions). The provisions of Title 28 of the Tennessee Code (governing limitation of actions), however, do not apply to bar actions brought by the State unless otherwise expressly provided by law. T.C.A. § 28–1–113 (1980).

■ Political subdivisions of the State are not automatically entitled to state immunity from the operation of the statute of limitations. Only when a legal corporation, such as a municipality or school board, acts as an agency and arm of the State in executing a public function is that agency entitled to the immunity provided under T.C.A. § 28–1–113; *Central Hospital for Insane v. Adams,* 134 Tenn. 429, 183 S.W. 1032, 1033 (1916). In *Adams,* the Supreme Court of Tennessee held that the Central Hospital for the Insane was not barred by the six year statute of limitations in seeking to recover compensation for care given a patient at the hospital. In ruling that the limitations period did not operate to bar the claim, the Court held that the care and custody of insane persons constituted the discharge of a government-assumed duty, thereby cloaking the institution with the sovereign immunity enjoyed by the State. *Id.,* 183 S.W. at 1034. Similarly, in *Jennings v. Davidson County,* 208 Tenn. 134, 344 S.W.2d 359, 362 (1961), Davidson County was permitted to pursue a claim against the estate of a former patient who, though during treatment was a pauper, had later inherited the modest estate of a relative. The Tennessee Supreme Court held that the provision of medical care to the poor is a public function carried on by local governments and constituted the discharge of a state-assumed duty to the population of all Tennessee.

The principle that political subdivisions of the state are, under certain circumstances, entitled to the state's sovereign immunity when pursuing civil claims was re-affirmed most recently in *County of Johnson, Tennessee v. United States Gypsum Company,* 580 F.Supp. 284 (E.D.Tenn. 1984). In that case, the district court held that the statute of limitations operated to bar the claims of a county school board suing for damages resulting from the installation of asbestos-containing acoustical and ceiling plaster throughout county schools. The Court reasoned that the maintenance of the physical plant of county structures constituted a purely local function of interest only to the local population. *Id.* at 288–89.[3] Distinguishing a series of other Tennessee state cases in which local political subdivisions were entitled to immunity from the statute of limitations, the Court held that the county in this particular situation was suing on claims involving contract or property rights, rather than in a governmental capacity for the benefit of the general public. *Id.* See also *Hamblen County v. Cain,* 115 Tenn. 279, 89 S.W. 103 (1905); *Shelby County v. Bickford,* 102 Tenn. 395, 52 S.W. 772 (1899) (action by county to recover against a grantor on covenant against encumbrances).

The maintenance of the physical structure and land of county schools is a local concern and function. However, the provision of public education, involving matters of curriculum, funding, teacher qualifications and compensation, and other academic considerations are state concerns, albeit often shared by local officials. *Leeper v. State,* 103 Tenn. 500, 53 S.W. 962 (1899). *See* discussion, *supra* at pp. 1146–1148.

■ This Court finds that Metro's claims constitute claims made as an arm of the state government regarding the discharge of a state assumed public duty. Just as a political subdivision is immune

3. This Court views the *Johnson County* case as setting forth the relevant considerations for determining whether a political subdivision is entitled to immunity from the statute of limitations. However, the Court takes exception to the overbroad statement by the *Johnson County* Court that "the authorities across the country virtually unanimously hold, the operation of a school system is a particularly local affair." 580 F.Supp. at 290.

from the running of the statute of limitations for claims involving medical care provided to the indigent or to the insane, third party plaintiffs are entitled to immunity with respect to claims arising from the provision of education to the young.

### 2. *The State of Tennessee is Liable for a Continuing Violation of Federal Law Thereby Staying the Operation of the Statute of Limitations.*

 The vestiges of state-imposed segregation continue to be present in Davidson County. State officials are under a continuing obligation to act affirmatively to eliminate these debilitating effects. Yet, the State continues to refrain, maintaining that the issue of desegregation is one exclusively between this district court and local officials. This Court views the State's conduct as malfeasance, indicative of a continuing violation of federal law, thereby staying the running of the relevant statute of limitations.

 The statute of limitations begins to run from the date of the injury, or if the injury is not apparent, from the time the harm reasonably should have been discovered. However, when the injury-causing activity continues over time, unabated, that conduct is not legitimized by the passage of time. Unlike the doctrine of adverse possession in real property law, acquiescence to a continuing violation of constitutional rights does not extinguish the individual's rights. The failure of the attorneys for the various parties in this case to pursue their civil remedies against the State of Tennessee during the asserted statute of limitations period does not constitute a waiver of those rights and will not insulate the State from legal liability.

### D. *Principles of Equity Do Not Bar Third Party Plaintiffs from Pursuing their Legal Remedies.*

#### 1. *Laches.*

This case was filed in 1955 and a comprehensive desegregation order entered in 1971. Nevertheless, the State of Tennessee was not joined as a defendant until 1981. The State argues therefore that the doctrine of laches should bar the award of any relief against it. The Court disagrees.

 Mere delay is insufficient to justify the operation of laches. The doctrine requires both delay and injury. *Williams v. Cravens*, 31 Tenn.App. 246, 214 S.W.2d 57, 60 (Ct.App.), *cert. denied* (Tenn. 1948). The State has failed to allege any consequence that the Court reasonably can consider to have injured or prejudiced the interest of the State as a result of other parties' failure to have joined the State at a earlier date. In seeking to invoke the doctrine of laches, the State calls upon the Court to exercise its powers in equity. Accordingly, the Court will consider the dictates of fairness and justice and will evaluate all factors in determining whether relief should be barred against the State.

The State created and maintained a system of segregation between the races since statehood. That system remained in place, officially, through 1954. Even assuming delinquency on the part of other parties in this case in failing to join the State until 1981, fairness dictates that the actor primarily responsible for the discriminatory system should bear some responsibility for remedying the system's invidious consequences.

Finally, the racial minorities in Tennessee are, for the most part, concentrated in urban centers. Recognizing the affirmative legal obligation to eliminate the vestiges of state-imposed segregation, it is unfair to call only upon urban dwellers to bear the expenses of desegregation. The remedy should be carried out at the expense of all Tennesseans, both those residing in the cities and those who live in rural areas.

#### 2. *Unclean Hands.*

The State asserts that in view of Metro Nashville and Davidson County's recalcitrance in failing to comply with the Court's order to desegregate local schools, the State should not be forced to share in the cost of desegregating Nashville schools. The Court notes that the State likewise has

been less than enthusiastic about the prospects of desegregation. The failure to remove the State's unlawful constitutional and statutory provisions mandating segregation and its passage of statutory provisions authorizing the cutoff of funds to local schools districts voluntarily desegregating schools through busing reflects conduct taken in less than good faith, vis-a-vis the state's affirmative obligation to eradicate the effects of past discrimination.

■ If an equitable doctrine is to apply at all, the Court would look to the principles of *in pari delicto*. That is, recognizing that both Metro and the State have been culpable of acts taken in bad faith, as between the two, the State is just as, if not more, subject to condemnation for its conduct. The Court, however, refrains from assessing the relative reprehensibility of the conduct of the defendants in this action. Rather, it holds that whatever bad deeds Metro may be responsible for, that conduct will not operate to bar the State from sharing in its responsibility to desegregate Metropolitan Nashville and Davidson County schools.

E. *Relief.*

The Court hereby enjoins the State officials and the State of Tennessee from refusing to carry out their affirmative obligation to participate in eliminating the vestiges of past discrimination and to participate in the desegregation of Metro Nashville schools. Pursuant to the injunction, the Court directs the State to pay sixty percent (60%) of the costs directly attributable to the desegregation program. Directing payment of state funds is a necessary consequence of compliance in the future with a substantive federal-question determination." *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977).

The relief ordered today complies with the standards set forth by the Eighth Circuit Court of Appeals in *Liddell v. State of Missouri*, 731 F.2d 1294, 1305–09 (8th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct.

82, 83 L.Ed.2d 30 (1984), for evaluating the boundaries of the remedial power of federal district court in devising relief ordered against State officials in school desegregation cases. The *Liddell* court set forth three considerations: (1) the remedy must be closely tailored to the nature and scope of the violation; (2) the remedy must seek to restore the victims of discrimination as nearly as possible to the position they would have occupied absent the discrimination; and (3) the order must not unduly infringe on state or local government autonomy.

This Court concludes that the order in this case directing the State to assume part of the costs of desegregating Metro Nashville schools is responsive to the constitutional violations and injuries that have occurred. The infusion of state funds into the Metro desegregation effort will permit Metro to offer those remedial programs which currently are part of the comprehensive remedial plan but presently are not offered because of insufficient funding. The effects of past discrimination continue to be manifested in many school age black children in terms of levels of performance on standardized testing, development of effective communication skills, and the ability to earn high school and higher education degrees. The present desegregation plan seeks to ameliorate these conditions. The payment of State funds to finance the remedial programs seek to improve the educational opportunities for black children so as to permit them to achieve a level of academic performance that reasonably could be expected had the black population not have been subjected to long term segregation in public education. Finally, the Court believes that the impact on the state treasury will not unduly infringe on the state's ability to carry on traditional state functions. The remedy is not intrusive on the autonomy of state officials to exercise discretion over state affairs.

For these reasons, the Court grants the motion of Metropolitan Nashville and Davidson County for summary judgment.