Robert W. KELLEY, et al., Plaintiffs,

v.

METROPOLITAN COUNTY BOARD OF
EDUCATION OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE, et
al., Defendants–Third–Party Plaintiffs–
Appellees, Cross–Appellants,

v.

STATE OF TENNESSEE; Lamar Alexan-
der, Governor of the State of Tennes-
see; Robert L. McElrath, Commissioner
of Education and State Board of Edu-
cation, Third–Party Defendants–Appel-
lants, Cross–Appellees.

Nos. 85–5837, 85–5838.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 12, 1986.

Decided Dec. 30, 1987.
Rehearing and Rehearing En Banc
Denied March 15, 1988.

William R. Willis, Jr., Marian F. Harrison (argued), Willis and Knight, Nashville, Tenn., for defendants-third-party plaintiffs-appellees, cross-appellants.

W.J. Michael Cody, Atty. Gen. of Tennessee, Nashville, Tenn., R. Stephen Doughty, Stephen Nunn (argued), for third-party defendants-appellants, cross-appellees.

Before ENGEL, NELSON and RYAN, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This case originated in 1955 as a desegregation action brought by a group of black school children and their parents against the school board of Nashville, Tennessee. A similar action was filed in 1960 against the board of education of Davidson County, in which Nashville is located. The actions were consolidated, and the original defendants were replaced by the Metropolitan County Board of Education of Nashville and Davidson County, Tennessee ("Metro"). The subsequent history of the litigation is well set out in the district court's opinion, reported at 615 F.Supp. 1139 (M.D. Tenn.1985), and in an earlier opinion reported at 492 F.Supp. 167 (M.D.Tenn.1980); we shall not repeat the story here.

The present dispute began in 1981—some 26 years after the start of the lawsuit—when Metro filed a third-party complaint against the State of Tennessee, the state board of education, and certain state officials. As amended in 1983, the third-party complaint asked, in essence, that the state be required to pay the full cost of implementing the desegregation remedies ordered by the district court in 1971 and subsequent years.

Metro moved for partial summary judgment on its third-party complaint. In disposing of that motion the district court held that "a retroactive award for costs already sustained" would be prohibited by the Eleventh Amendment of the United States Constitution. 615 F.Supp. at 1147. Finding no constitutional impediment to an award of relief prospectively from the date on which the third-party complaint was filed, how-

ever, the court entered an order reading as follows:

"The State of Tennessee and state officials named as defendants shall be enjoined from refusing to carry out their duty to participate in the elimination of the vestiges of past discrimination in the State's public education system. To insure compliance with the injunction, the Court orders the State to assume sixty percent (60%) of the costs directly attributable to Metro's desegregation program from and after the date of the filing of this petition on March 16, 1981...."

The state and the other third-party defendants appeal from that order, arguing, among other things, that it violates the principle of sovereign immunity. Metro cross-appeals, contending that the state ought to be held responsible not only for costs incurred from and after the filing of the third-party complaint, but also for costs incurred in the decade before. The original plaintiffs are not parties to either appeal.

Having concluded that the federal courts would not be justified in shifting any of the costs in question from Metro to the State of Tennessee, we shall reverse the district court's order, deny the cross-appeal, and direct that judgment be entered in favor of the state and the other third-party defendants.

## I

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This language does not, by its terms, insulate a state from suit by its own citizens. The Supreme Court of the United States has long held, however, that such suits are barred unless the state has consented to be sued. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Adoption of the Eleventh Amendment, the Supreme Court has declared, constituted an "affirmation that the fundamental principle of sovereign immunity limits the grant of [federal] judicial authority in Art. III" regardless of the plaintiff's citizenship. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984); *cf. Ex parte New York,* 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921).[1]

■ The principle of sovereign immunity is a "broad" principle, as well as a fundamental one. *Welch v. State Dep't of Highways,* 483 U.S. ——, 107 S.Ct. 2941, 2952, 97 L.Ed.2d 389, 404 (1987). And that broad fundamental principle, as Justice Powell wrote in *Welch,* "has been among the most stable in our constitutional jurisprudence." *Id.,* 483 U.S. at ——, 107 S.Ct. at 2952, 97 L.Ed.2d at 405. It constitutes "an absolute bar" to a state's being sued by its own citizens, among others, *Monaco v. Mississippi,* 292 U.S. 313, 329, 54 S.Ct. 745, 750, 78 L.Ed. 1282 (1934)—and if a state cannot be sued by its own citizens, *a fortiori* it cannot be sued by its own political subdivisions, which are creatures of the state and exist only at the state's sufferance.

■ The State of Tennessee is not the only third-party defendant in the case at bar, of course, but a long line of Supreme Court decisions teaches that "when the action is in essence one for the recovery of

---

1. Justice Brennan, in a series of powerful dissents, has argued that insofar as judges have extended the doctrine of sovereign immunity beyond the actual language of the Eleventh Amendment, the doctrine ought to be repudiated as lacking "a textual anchor, a firm historical foundation, or a clear rationale." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 257, 105 S.Ct. 3142, 3155, 87 L.Ed.2d 171 (1985); *cf., inter al., Employees of the Dep't of Public Health & Welfare v. Missouri Dep't of Public Health & Welfare,* 411 U.S. 279, 298, 93 S.Ct. 1614, 1625, 36 L.Ed.2d 251 (1973); *Edelman v. Jordan,* 415 U.S. 651, 687, 94 S.Ct. 1347, 1367, 39 L.Ed.2d 662 (1974); *Yeomans v. Kentucky,* 423 U.S. 983, 96 S.Ct. 404, 46 L.Ed.2d 309 (1975); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 125, 104 S.Ct. 900, 921, 79 L.Ed.2d 67 (1984); *Welch v. State Dep't of Highways,* 483 U.S. ——, ——, 107 S.Ct. 2941, 2957–58, 97 L.Ed.2d 389, 411 (1987). Obviously, however, it is not within the province of an inferior court such as ours to reverse Supreme Court precedent that "has been assumed to be the law for nearly a century." *Welch,* 483 U.S. at ——, 107 S.Ct. at 2957–58, 97 L.Ed.2d at 411 (Scalia, J., concurring).

money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945), as quoted and followed in *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). Although *Edelman* was a suit against individual officers, as the Supreme Court subsequently explained, "the case was in effect a suit against the State itself because a judgment payable from state funds was demanded." *Cory v. White*, 457 U.S. 85, 90, 102 S.Ct. 2325, 2328, 72 L.Ed.2d 694 (1982).

■ The third-party action brought by Metro against the State of Tennessee and its officials is essentially one for the recovery of money from the state, and the presence of individual officials as nominal third-party defendants cannot make of the action something it is not. The "absolute bar" of sovereign immunity therefore applies. The applicability of the bar of sovereign immunity simply is not affected by the circumstance that the nominal defendant is an individual state official, *Ford Motor Co.*, *supra*, any more than it is affected by the circumstance that the relief sought is equitable rather than legal in nature, *Papason v. Allain*, 478 U.S. 265, ——, 106 S.Ct. 2932, 2939–40, 92 L.Ed.2d 209, 226 (1986), or the circumstance that the case is one in which a federal constitutional violation is alleged. *Pennhurst, supra; Edelman, supra.*

It is true that the constitutional provision that was violated by the State of Tennessee (and by Metro's predecessors) is the Equal Protection Clause of the Fourteenth Amendment, and not, as in *Hans v. Louisiana*, the Contract Clause of the original Constitution. If the nature of the constitutional violation makes any difference, however, it cuts in favor of respecting the state's sovereign immunity in this case. Although it remains to be decided whether Congress has the power to abrogate the states' immunity from lawsuits in which a violation of the original Constitution is al-

leged (see *Welch*, 483 U.S. at ——, 107 S.Ct. at 2946, 97 L.Ed.2d at 397), it is clear that "Congress *can* abrogate the Eleventh Amendment without the States' consent when it acts pursuant to its power 'to enforce, by appropriate legislation' the substantive provisions of the Fourteenth Amendment." *Welch*, 483 U.S. at ——, 107 S.Ct. at 2946, 97 L.Ed.2d at 397 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), and § 5 of the Fourteenth Amendment) (emphasis supplied). The logic of current Supreme Court doctrine seems to be that the question whether the states are to be made subject to suit for violations of the Fourteenth Amendment is a question that has been entrusted to Congress, not to the courts. *Cf. Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242–43, 105 S.Ct. 3142, 3147–48, 87 L.Ed.2d 171 (1985).

It might once have been arguable that Congress abrogated the states' immunity from suit for Fourteenth Amendment violations when it enacted the Ku Klux Klan Act of 1871, the precursor to 42 U.S.C. § 1983, but the Supreme Court has rejected the contention that Congress intended, by the general language of § 1983, to override the states' traditional sovereign immunity. *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Atascadero State Hospital*, 473 U.S. at 242, 105 S.Ct. at 3147. Congress has enacted no such statute, and the federal courts have no authority to enact one for it.

It bears emphasis that we are not here called upon to adjudicate the rights of plaintiffs suing to obtain the equal educational opportunities promised them in *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Those plaintiffs have long since won their case. They won it without ever having asserted any claim against the state. They are already receiving— through decrees that do no violence to the principle of sovereign immunity—the full

measure of relief to which they are entitled under the Constitution.

The issue before us is not whether children in the Metro schools will receive the benefits of the enhanced educational programs that the district court ordered Metro to develop and implement. The educational components of Metro's desegregation plan have already been affirmed by this court (687 F.2d 814 (6th Cir.1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983)), and Metro makes no claims—notwithstanding an admission at oral argument that those components "have not been as fully implemented as they should be"—that it is incapable of complying with the educational components of the plan. Similarly, the issue is not whether the school children will be transported in accordance with the mandatory busing plan which, as modified several years ago to meet the requirements of this court, has been in effect for more than a decade and a half. That busing plan, we are told, "has been fully implemented." Neither the district court's broad power to require that the Metro schools be desegregated nor its power to require appropriate action to eliminate any lingering consequences of *de jure* segregation is in question here, and the vitality of the Supremacy Clause of the United States Constitution will not suffer in any way from our reversal of the district court's order. The contest between Metro and the State of Tennessee is a contest not about desegregation, but about money.

The amount of money at issue is substantial; it comes, we are told, to some $6 million per year. The state currently underwrites about 30% of Metro's non-transportation costs, and it pays a still larger share of the costs of transportation; Metro, however, wants more. The state treasury can be compelled to provide more, Metro argues, because of the "prospective compliance" exception carved out of the doctrine of sovereign immunity by *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In *Ex parte Young,* as the district court explained,

"the Supreme Court recognized the 'prospective-compliance' exception to the jurisdictional bar of the Eleventh Amendment, permitting federal courts to enjoin ongoing conduct by a state official that is in violation of federal law. The 'fiction' of *Young* holds that a state may not authorize an unconstitutional action by its officers. Hence, for Eleventh Amendment purposes, a state official is stripped of his official status and subject to the consequences of his conduct when he acts in an unlawful manner." 615 F.Supp. at 1146.

Thus it was that the Supreme Court held, in *Young,* that although the state itself could not be enjoined from enforcing an unconstitutional statute, individual state officials could be; officials "who threaten and are about to commence proceedings ... to enforce ... an unconstitutional act ... may be enjoined by a Federal court of equity from such action." 209 U.S. at 156, 28 S.Ct. at 452.

Unlike the individual state officials in *Ex parte Young,* the individual third-party defendants in the case at bar are not threatening to enforce any unconstitutional act. The district court says, in its opinion, that the Tennessee officials are being enjoined "from continuing to refuse to discharge their duty to participate in the implementation of desegregation of Metro schools," 615 F.Supp. at 1151, but the "participation" mandated by the district court's order is purely financial; the officials will not be in contempt of the court's order if they pay 60% of Metro's desegregation costs out of the state treasury, and they will be in contempt if they fail to do so. The Tennessee officials are not currently doing anything wrong, and they have not been joined in this case to prevent them from doing anything wrong; they have been joined solely to permit one sometime constitutional wrongdoer to recover monetary compensation from another. But as the Supreme Court has repeatedly told us, such "compensatory" interests "are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); *cf. Papasan,* 478 U.S. at —— –

——, 106 S.Ct. at 2940, 92 L.Ed.2d at 226–27.

The Supreme Court explained in *Papasan* that *"Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly ... to meet third-party interests such as compensation." *Papasan,* 478 U.S. at ——, 106 S.Ct. at 2940, 92 L.Ed.2d at 226–27. The case at bar is one where the relief sought is intended "to meet third-party interests such as compensation," and not one where "relief against the state official directly ends ... [an ongoing] violation of federal law." *Ex parte Young* has no legitimate application here.

That Metro's "compensatory interest" is being satisfied only prospectively is a circumstance devoid of constitutional significance. A case in point is *Louisiana v. Jumel,* 107 U.S. (17 Otto) 711, 2 S.Ct. 128, 27 L.Ed. 448 (1883). There, as here, unconstitutional state action had led to the assertion against state officers of what amounted essentially to claims for both retrospective and prospective monetary relief; both forms of relief were held barred by the sovereign immunity doctrine. Holding that the state officials simply were not subject to suit in the federal court, the Supreme Court concluded that the relief sought—future relief, as well as relief in respect of obligations already accrued—could not be granted in the absence of a waiver by the state of its sovereign immunity:

"When a State submits itself, without reservation, to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the State has by its act of submission allowed to be done; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the courts, when a State cannot be sued, to set up its jurisdiction over the officers in charge of the public moneys, so as to control them as against the political power in their administration of the finances of the State. In our opinion, to grant the relief asked for ... would be to exercise such a power." *Jumel,* 107 U.S. at 728, 2 S.Ct. at 142.

Although it has been afforded many opportunities to do so, the Supreme Court has never repudiated *Louisiana v. Jumel;* in literally dozens of subsequent decisions, on the contrary, the Supreme Court has cited that seminal case or its progeny with every indication of approval. (See, *e.g., Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944), and the numerous cases there cited: "[The] ruling that a state could not be controlled by courts in the performance of its political duties through suits against its officials has been consistently followed." *Id.* at 51, 65 S.Ct. at 875.) If *Louisiana v. Jumel* is still good law, it is controlling here.

It could be argued, perhaps, that *Louisiana v. Jumel* was overruled *sub silentio* by *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the Supreme Court decision that comes closer than any other to justifying the result reached by the district court in this case. The monetary relief granted in *Milliken* was merely ancillary to other affirmative relief, however, and the monetary relief granted here is not. That fact, coupled with the reasoning of post-*Milliken* cases in which the Supreme Court has "aggressively" expanded the doctrine of sovereign immunity (*Welch v. State Highway Dep't,* 483 U.S. at ——, 107 S.Ct. at 2958, 92 L.Ed.2d at 411 (Brennan, J., dissenting)), leads us to believe that the principle followed in *Louisiana v. Jumel* is still sound.

The payment of money was not perceived to be all that was required of the state defendants in *Milliken.* As we noted in our own opinion in that case, 540 F.2d 229, 240 (6th Cir.1976), "the District Court directed that the Detroit Board *and the State* put into effect certain comprehensive programs which were found to be essential to the success of the desegregation effort."

(Emphasis supplied.) That understanding was shared by the Supreme Court; the Court's opinion notes that "the [district] court directed the Detroit Board *and the State Department of Education* to institute a testing program," and "the [district] court ordered the Detroit Board *and the state defendants* to institute comprehensive programs as to the four educational components [of the desegregation plan.]" 433 U.S. at 276–77, 97 S.Ct. at 2755 (emphasis supplied). It was immediately after this sentence that the Supreme Court noted that "[t]he cost of these four programs ... was to be equally borne by the Detroit School Board and the State." *Id.* at 277, 97 S.Ct. at 2755.

■ The Supreme Court went on to hold, in *Milliken,* that the district court's decree "fits squarely within the prospective-compliance exception" carved out of the sovereign immunity doctrine by *Ex parte Young, supra.* The exception is a narrow one; in the words of the *Milliken* court, it merely "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." 433 U.S. at 289, 97 S.Ct. at 2762. *"The order challenged here,"* the *Milliken* court continued, *"does no more than that." Id.* (emphasis supplied). The order was thus within the district court's constitutional power, as the Supreme Court subsequently explained, "even though accompanied by a substantial *ancillary* effect on the state treasury." *Papasan,* 478 U.S. at ——, 106 S.Ct. at 2940, 92 L.Ed.2d at 227 (emphasis supplied).[2]

The effect on the state treasury of the order entered by the district court in the case at bar is not "ancillary" to anything at all, other than the command to "assume sixty percent (60%) of the costs directly attributable to Metro's desegregation program." The order to pay is ancillary only to itself, in other words, and therefore it

goes beyond *Milliken.* If the payment order in *Milliken* had not been ancillary to some command outside itself, affirmance of the order would have been utterly inconsistent with *Jumel.* The latter decision was specifically called to the Court's attention in the brief filed by the state defendants in *Milliken* (see 53 L.Ed.2d 1224), and the fact that *Jumel* was not cited in the *Milliken* decision thus suggests that the Court did not intend to overrule it.

That conclusion is strengthened, we believe, by *Pennhurst, supra,* decided seven years after *Milliken.* Justice Powell, who delivered the opinion of the Court in *Pennhurst,* there cited both *Jumel* and *Ford Motor, supra,* in support of the "well established" proposition that "[t]he Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908 (quoting *Ford Motor, supra.*) Justice Powell's own concurring opinion in *Milliken* had emphasized that much of the Court's opinion in that case possessed only "limited precedential effect," 433 U.S. at 292, 97 S.Ct. at 2763, and the Justice's subsequent treatment of *Jumel* in *Pennhurst* shows plainly that he did not read *Milliken* as having overruled *Jumel.*

We find nothing to the contrary in *Papasan, supra.* That was a direct action brought against the Governor of Mississippi and other state officials by a group of disadvantaged school children and certain local school officials who alleged that the Equal Protection Clause was being violated by a "present disparity in the distribution of the benefits from the State's Sixteenth Section [school] lands." 478 U.S. at ——, 106 S.Ct. at 2942, 92 L.Ed.2d at 229. Pointing out that the alleged violation was "current" and "ongoing," and stressing that "the essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and

---

**2.** See also *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979), where the Court cited *Milliken* just after noting that in *Edelman,* 415 U.S. at 667–68, 94 S.Ct. at 1357–58, the Court had observed that "a federal court, consistent with the Eleventh Amendment, may

enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an *ancillary* effect on the state treasury." (Emphasis supplied.)

not the past actions of the State," the Court declared itself unwilling to rule out a "remedy to eliminate this current disparity, even a remedy that might require the expenditure of state funds...." *Id.* at ——, 106 S.Ct. at 2942, 92 L.Ed.2d at 230.

The disparity complained of in *Papasan* was that the schools attended by the plaintiff children were receiving school-land funds of only 63 cents per pupil at a time when schools elsewhere in the state were receiving an estimated $75.34 per pupil. Although the plaintiffs claimed that they were not receiving a minimally adequate education, the Supreme Court explicitly declined to try to resolve the issues raised by that claim. Instead, the Court remanded the case for consideration of the following issue: "Given that the State has title to assets granted to it by the Federal Government for the use of the State's schools, does the Equal Protection Clause permit it to distribute the benefit of these assets unequally among the school districts as it now does?" *Id.* at ——, 106 S.Ct. at 2946, 92 L.Ed.2d at 234.

If it should be decided, on remand of the *Papasan* case, that the Constitution does not permit the "benefit" of the school lands to be distributed unequally, the appropriate remedy would seem to be an order directing the authorities to recalculate their division of the benefit and to start distributing the benefit in equal shares. Such an order would, to be sure, entail increased payments to the schools that had been receiving only 63 cents per child, but it would necessarily entail a corresponding *decrease* in payments to the schools that had been getting $75.34 per child. The total benefit from the school lands would remain the same; the only change would be in its division. The ancillary effect of the order on the state's treasury would be absolutely nil, except insofar as the state might elect voluntarily to increase appropriations from the general funds of the state for schools suffering a reduction in receipts from Sixteenth Section lands.

That is a totally different situation from the one presented in the case at bar, where the State of Tennessee has been ordered to spend money it would not otherwise have been under any obligation to spend at all. Tennessee, moreover, has been ordered to spend this additional money on the basis of *past* violations of the Constitution—and *Papasan* leaves no room for doubt that "[r]elief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant." *Id.* at ——, 106 S.Ct. at 2940, 92 L.Ed.2d at 227 (footnote omitted).

This suggests an independent reason why *Milliken v. Bradley* cannot justify the extraordinary relief ordered here. The *Milliken* litigation was begun in 1970, and by the time it reached the Supreme Court (for the second time) in 1977, the State of Michigan, "in a finding no longer subject to review, ... [had been] adjudged a participant in the constitutional violations...." 433 U.S. at 295, 97 S.Ct. at 2764, 53 L.Ed.2d at 765 (Powell, J., concurring). The case at bar, in contrast, was begun in 1955, and not until 30 years later, in 1985, did the district court find that the State of Tennessee "is a 'constitutional wrongdoer' culpable [and answerable] for the continuing effects of state-imposed segregation...." 615 F.Supp. at 1142. That finding is, of course, subject to review here, and we have searched the record of this case in vain for any demonstration that the integration of metropolitan Nashville's schools has been wrongfully impeded by anything the state has done, or has failed to do, in the 1970s or 1980s.[3]

---

3. It is true that in 1970 the Tennessee legislature enacted a statute prohibiting boards of education from requiring busing to achieve, in the words of the statute, "a racial balance or racial imbalance in any school." Acts 1970 (Adj. S.), ch. 491, § 2. (That statute was enacted some months before the district court, in what we have described as a "careful opinion," 436 F.2d 856, 859 (6th Cir.1970), made it clear that under the law as it then stood, "the compulsory busing of pupils to achieve any sort of mathematically ideal balance is not required by the decisions of the Supreme Court." 317 F.Supp. 980, 990 (M.D.Tenn.1970).) In an order dated July 15, 1971, the district court adopted a desegregation plan that did require mandatory busing to achieve racial balance. There is no evidence in

The mere fact that Tennessee was a constitutional wrongdoer prior to 1956 does not mean that it was still a constitutional wrongdoer when the district court entered its order 30 years later. As Justice Powell wrote more than a decade ago,

> "The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities." *Austin Independent School District v. United States,* 429 U.S. 990, 994, 97 S.Ct. 517, 519, 50 L.Ed.2d 603 (1976) (Powell, J., concurring in grant of certiorari).

The state did have "an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system,'" *Keyes v. School District No. 1,* 413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548 (1973), quoting *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955), but in 1956 the Supreme Court of Tennessee struck down all provisions of state law requiring segregation of the races in the public schools, *Roy v. Brittain,* 201 Tenn. 140, 297 S.W.2d 72 (1956), and the old system of *de jure* segregation was completely dismantled in the 1960s. The state's duty in this respect was discharged long before Metro filed its third-party complaint against the state.

■ Although the state may still have an affirmative obligation to see that the lingering effects of *de jure* segregation are eliminated, the existence of such an obligation does not compel either the conclusion that the state must discharge the obligation directly or the conclusion that the state may assign to its subdivisions no more than 40% of the cost of discharging it. "Municipal corporations [and metropolitan school boards] are political subdivisions of the State," after all, "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Hunter v. Pittsburgh,* 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907). In *Brown II,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Supreme Court "held that the primary responsibility for abolishing the system of segregated schools would rest with the local school authorities." *United States v. Montgomery County Board of Education,* 395 U.S. 225, 226, 89 S.Ct. 1670, 1671, 23 L.Ed.2d 263 (1969). If the State of Tennessee has chosen to let local school boards pull the laboring oar in attempting to eliminate the consequences of segregation, that is no more an evasion of state responsibility than if the state had chosen to act solely

---

the record to suggest that the 1970 statute ever had the slightest effect on busing in Nashville.

The work-product of the 1970 Tennessee legislature cannot be fairly evaluated, moreover, without taking into account the fact that the same legislature passed a law providing, among other things, that "[n]o person shall be refused admission into or be excluded from any public school in the state of Tennessee on account of race, creed, color, sex or national origin." Acts 1970 (Adj. S.), ch. 474, § 1.

The district court complains of "numerous official antibusing resolutions," 615 F.Supp. at 1149, including, presumably, House Joint Resolution No. 342, adopted March 22, 1972, where "all members of the Tennessee Congressional Delegation [were] commended for their stand against bussing," and House Joint Resolution No. 376, approved April 19, 1972, formally petitioning the Department of Justice to intervene in pending lawsuits in Memphis, Nashville and Chattanooga pursuant to a recent message in which the President of the United States had said "that the U.S. Department of Justice might intervene in local school cases where school

bussing was ordered by the courts in a manner that caused undue hardship and ill will." Whatever one may think of these resolutions and petitions to the national authorities, it is not to be supposed that the Fourteenth Amendment repealed the First; the merits of mandatory busing obviously constitute a legitimate subject for public debate and discussion. We expect our elected representatives to listen to the concerns of the community, and before the third-party defendants were joined as parties in this case an attentive listener would have heard "a white majority of the school board, acting on the advice of a white desegregation expert, recommending to the Court *more* busing to achieve *more* racial balance," at the same time that "the black plaintiff urge[d] upon the Court *less* busing, *more* neighborhood characteristics to the assignment plan, and the permissibility of majority black schools." 492 F.Supp. at 184. Men and women of good will obviously can and do differ on these extraordinarily difficult questions, and this is an area where no one can honestly claim to be certain that the policies he or she favors are the wisest policies.

through the State Department of Education. "The very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them'...." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973), quoting *Jefferson v. Hackney,* 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972). The record in this case simply does not show that the State of Tennessee is currently a participant in any constitutional violation.

In the post-*Milliken* case of *Green v. Mansour,* 474 U.S. 64, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985), finally, the Supreme Court held that not even a declaratory judgment may be entered against state officials "when the result would be a partial 'end run' around our decision in *Edelman v. Jordan,* 415 U.S. 651 [94 S.Ct. 1347].... " The *Edelman* decision, as the Supreme Court reiterated in another post-*Milliken* case, *Cory v. White,* 457 U.S. 85, 90 n. 2, 102 S.Ct. 2325, 2329 n. 2, 72 L.Ed. 2d 694 (1982), "recognized the rule 'that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.'" To read *Milliken* as justifying the order entered in the case at bar would be to sanction just the kind of "end run" around *Edelman* that *Green v. Mansour* forbids.[4]

## II

■ The order before us represents not only an end run around *Edelman,* but an "end-run around the ... legislature's allocation of state funds." *United States v. Texas Education Agency,* 790 F.2d 1262, 1265 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). Under our tradition of government, that is a very serious matter.

Echoing a provision found in Article I, § 9 of the United States Constitution, the Constitution of the State of Tennessee provides that "[n]o public money shall be expended except pursuant to appropriations made by law." Tenn. Const. art. II, § 24. (*Cf.* Tenn.Code Ann. § 9–7–101(a): "No money shall be drawn from the state treasury except in accordance with appropriations duly authorized by law.") These "appropriations," of course, are appropriations made by the state legislature in laws either approved by the governor of the state or passed by the legislature over his veto. Tennessee law thus contemplates that the money raised by the state through taxation of its people is to be expended only as the people themselves direct, in laws enacted by representatives chosen by the people and accountable to them at election time.

The federal judiciary clearly has the duty and the power to prohibit segregation in the schools of Tennessee, but in no way does it follow that the judiciary has any corresponding authority to dictate the spe-

4. In *Reed v. Rhodes,* 662 F.2d 1219 (6th Cir. 1981), *cert. denied,* 455 U.S. 10–18, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982), and *Penick v. Columbus Board of Education,* 663 F.2d 24 (6th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982), this court did affirm judgments ordering state defendants to share in the payment of school integration costs in Ohio. The defense of sovereign immunity was not considered or ruled on in either case, however.

Other circuits appear to be divided as to whether federal courts must defer to the states in determining how school integration plans will be financed. See, *e.g., United States v. Indianapolis Bd. of School Comm'rs,* 677 F.2d 1185 (7th Cir.), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982) (state required to pay all costs where state was the sole violator; Eleventh Amendment not implicated because

the plaintiff was the United States); *Liddell v. Bd. of Education,* 667 F.2d 643 (8th Cir.1981), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982) (affirming order that state pay one-half of cost); *Evans v. Buchanan,* 582 F.2d 750, 774–80 (3d Cir.1978) (en banc), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980) (vacating order that imposed a higher school tax rate than the maximum authorized by state legislation); *United States v. Texas Educational Agency,* 790 F.2d 1262 (5th Cir.1986) *cert. denied,* —— U.S. ——, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987) (state not required to share costs where it had not been an active party to the litigation since 1970.) None of the court of appeals opinions we have examined can be said to demonstrate convincingly that the Supreme Court's sovereign immunity decisions do not mean what they seem to say.

cific financial arrangements under which the costs of integrating the schools shall be handled. As long as those costs are in fact paid, we see no justification for an unelected judiciary making policy judgments as to how the tax burden shall be allocated.

To date, at least, the judgment of the Tennessee legislature has been that school integration costs ought not be shifted from the taxpayers of individual school districts to the taxpayers of the state at large. The wisdom of that judgment is doubtless debatable, and our decision in this case may well lead to just such a debate—in the halls of the legislature, which is where the debate belongs. A judgment that 60%—or 10%, 30%, 90% or 100%—of all school integration costs ought to be assumed by the taxpayers at large would obviously be defensible as a matter of policy, and perhaps some such allocation would represent a sounder policy than the one the legislature has thus far chosen to follow. But while we may consider our judgment on such a question superior to the legislature's, we are not free to set the legislature's judgment aside and substitute our own. No matter how desirable we may think a shift in the tax burden would be, the accomplishment of such an end cannot justify resort to unconstitutional means. For us to assume a "legislative role," as Justice Powell put it in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 31, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973), would be to assume a role "for which the Court lacks both authority and competence."

In *Milliken I*, where the Supreme Court rejected the judicial creation of a "new super school district" for metropolitan Detroit, the Court said that implementation of that sort of remedy would create a whole host of complex questions, including fiscal and tax questions, with which judges are ill-equipped to deal. 418 U.S. 717, 743, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069 (1974).

After noting that "the District Court will become first, a *de facto* 'legislative authority' to resolve these complex questions, and then the 'school superintendent' for the entire area," the Court went on to observe that "[t]his is a task which few, if any, judges are qualified to perform and one which would deprive the people of control of schools through their elected representatives." 418 U.S. at 743–44, 94 S.Ct. at 3126–27.

The reason that federal judges are not "qualified" or "competent" to resolve these legislative questions is not that they are demonstrably deficient in the skills, talents and wisdom that legislators ought to possess. Many judges now sitting have served very ably in state legislatures or in Congress, and these people did not lose their aptitude for legislating when they assumed the bench. What they lost, rather, was their authority to legislate. The voters can remove a legislative representative from office, but cannot remove a federal judge from the bench; and that, under the American tradition, is a principal reason the legislator has been entrusted with broader authority than the judge.[5]

For a state legislature to enact a 60%–40% split of school integration costs would be totally unexceptionable. The same 60%–40% split ordered by a federal court is another matter altogether. Not only are legislatures accountable to the electorate as courts of law are not, but the acts of a legislature are subject to change or repeal by the people, through their representatives, as acts of a court may not be. It has often been pointed out that when the act of a federal district judge is accompanied by the words "this is what the Constitution requires," the judge (given the concurrence of the appellate courts) has prevented the people's representatives from changing—ever—what he has done, unless the Constitution itself be changed. This is formidable power indeed; it is power that

---

5. The Vermont Constitution of 1777 is instructive in this connection:

"That those who are employed in the legislative and executive business of the state, may be restrained from oppression, the people have a right, at such periods as they may think proper, to reduce their public officers to a private station, and supply the vacancies by certain and regular elections." *Id.*, Ch. 1, § VII, as quoted in 4 P. Kurland & R. Lerner, *The Founders' Constitution* 559 (1987).

is necessary, to be sure, but because its exercise is not subject to political control and its conclusions are not subject to amendment by ordinary political means, it is power that we must guard against exercising on political questions.

If unelected judges are free to second-guess the people's elected representatives on how the costs of running the schools shall be allocated as between the state and its political subdivisions, may the judiciary also second-guess the people's representatives on what the overall level of costs shall be? Courts were never intended to become the final arbiters in the budgetary process at any level of government, local, state or federal; that is the job of the people's elected representatives. Thus it is that "[t]he consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States...." *Rodriguez*, 411 U.S. at 58, 93 S.Ct. at 1309.

In language of majestic simplicity, our Constitution provides that "The United States shall guarantee to every State in this Union a Republican Form of Government...." U.S. Const. Art. IV, § 4. A "republican" form of government, as Madison suggested in Number Ten of the Federalist Papers, is "a Government in which the scheme of *representation* takes place." (Emphasis supplied.) In few (if any) areas of government is Madison's "scheme of representation" more important than it is in the area of government finance and taxation. A principal cause of our Revolutionary War, after all, was the imposition of taxes without representation. The concept that "taxation without representation is tyranny" was one for which a number of the Framers had put their very lives on the line. Our Constitution was not adopted to perpetuate the evil that led us to break our ties with the British Crown.

More than a quarter of a century ago the Mayor of Nashville, suing "on behalf of himself and all residents of the City of Nashville, Davidson County," was permitted to join other Tennessee voters in a lawsuit alleging that there had been a "debasement of their votes," in violation of the Fourteenth Amendment, because of a malapportionment of legislative seats among the counties of the state. That lawsuit led to a landmark Supreme Court decision holding that the plaintiff voters had a judicially cognizable interest "in maintaining the effectiveness of their votes." *Baker v. Carr*, 369 U.S. 186, 208, 82 S.Ct. 691, 705 7 L.Ed. 2d 663 (1962), quoting *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939). Although the plaintiffs in *Baker v. Carr* did not rely on the specific constitutional guarantee of a republican form of government, and the Supreme Court did not read the plaintiffs' claim as resting on that guarantee, the Court did observe that "[i]t is inconceivable that guaranties embedded in the Constitution of the United States may ... be manipulated out of existence." *Id.* 369 U.S. at 230, 82 S.Ct. at 717, quoting *Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583, 594, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926), as quoted in *Gomillion v. Lightfoot*, 364 U.S. 339, 345, 81 S.Ct. 125, 129, 5 L.Ed.2d 110 (1960). The Supreme Court's vigilance in guarding against the impairment of voting rights has helped give life and substance to the core values embodied in the constitutional guarantee of a republican form of government. "Recognition of 'one person, one vote' as a constitutional principle," it has been said with some authority, "redeems the promise of self-governance...." Brennan, "My Encounters with the Constitution," *Judge's Journal* 6, 59 (Summer 1987). The "promise of self-governance" would prove hollow indeed if the right to a meaningful and effective vote were to be manipulated out of existence by the judiciary itself, through decisions tending to debase the people's votes by shifting the legislative power from a body the people can vote for to one they cannot vote for.

### III

An obvious rejoinder, it might be thought, is that the State of Tennessee once was—and may still be—a "constitutional wrongdoer," and there is nothing improper about judges directing such

wrongdoers to pay for the righting of their wrongs. Again, however, the existence of a duty to eliminate the continuing effects of past racial segregation does not mean that the duty may only be discharged through taxes levied by the state, as opposed to taxes levied by the counties of the state. This "constitutional wrongdoers must pay for their wrongs" argument has little or no force where we are talking about two political entities, a state and one of its own subdivisions, each of which has done wrong (as have subdivisions not now before us), and where the men and women representing the electorate of the state as a whole—an electorate that includes the voters of all the subdivisions—have chosen not to enact legislation shifting to the state as a whole the costs of repairing the wrongs within each subdivision.

■ Federal courts may not be called upon, in the first instance, "to adjudicate what is essentially an internal dispute between two local governmental entities, one of which is asserting unconstitutional conduct on the part of the other." *South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500, 507 n. 1 (6th Cir.1986) (Engel, J., concurring). That being so, we do not see how they may be called upon to adjudicate an internal dispute between a local governmental entity and the very state that created it. One of the principles recognized in the great case of *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819)—a principle that subsequent decisions have "moved from the area of dicta ... to established federal constitutional law," as the *South Macomb* concurrence notes—is the principle that

"because municipal bodies are essentially creatures of the state and because the state retains the inherent power to alter, change or even to abolish them in accordance with the state's constitution and laws made thereunder, the United States Constitution simply does not concern itself with matters of internal disagreements between a state and subdivisions created by it ... for this area involves matters which the state is uniquely competent to resolve." 790 F.2d at 507.

Thus it was that in *City of Trenton v. State of New Jersey*, 262 U.S. 182, 192, 43 S.Ct. 534, 538, 67 L.Ed. 937 (1923), the Supreme Court declared that constitutional restraints sought to be invoked by the City of Trenton against its parent state

"do not apply as against the State in favor of its own municipalities. We hold that the City cannot invoke these provisions of the Federal Constitution against the imposition of the [State] license fee ... here in question."

Citing *City of Trenton*, this court, speaking through Judge Contie, said in *South Macomb* that "a municipal corporation 'cannot invoke the protection of the Fourteenth Amendment' against its own state," at least where that protection is sought to be invoked by the local government body "in its own right." 790 F.2d at 504–05.

■ If this court were to dismiss the State of Tennessee as a formal party but otherwise affirm the order entered by the district court in the case at bar, the state and its treasury would still be the real third-party defendants. Metro, the third-party claimant, is a political subdivision of the state, and the claim it asserts is asserted by Metro in its own right. A local school board can have an agency of the state enjoined from taking a step that would tend "to deprive [the local body's] school students of their constitutional right to attend nonsegregated schools," *Akron Board of Education v. State Board of Education of Ohio*, 490 F.2d 1285, 1288 (6th Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *cf. Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), but that is not our case. In our case the claimant—an active participant in the same wrongs on which it now bases its claim for indemnification—has sued solely in its own right, just as the claimant in *South Macomb* did, and thus is barred, as the *South Macomb* claimant was, by the principle recognized in *Dartmouth College* and *City of Trenton*.

## IV

■ Even if there were no question of the district court's constitutional authority

to act in this case, we should not consider the order before us a defensible exercise of the federal equity power. It is true that judgments of the sort reflected in the order are "inescapably particularistic," but it is hard to quarrel with the generalization that "how the State ... chooses to pay for busing is, at least in the first instance, the business of the State ... rather than the federal courts." *United States v. Board of School Commissioners of City of Indianapolis*, 677 F.2d 1185, 1190–91 (7th Cir.) (Posner, J., dissenting), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). "My contention that the financing issue ought to be left to the state to resolve," Judge Posner went on to explain in that dissent, "derives from the nature of our federal system, which implies that interventions by federal courts into the processes of state government ought to be minimized, but more simply from traditional notions of equity jurisprudence." 677 F.2d at 1191–92. We agree.

The "nature of our federal system" itself suggests that a federal court of equity, in the exercise of its sound discretion, ought to refrain from making policy decisions on the extent to which the financing of local school systems will be assumed by the taxpayers of the state at large. The one who pays the educational piper generally gets to call the educational tune, as many thoughtful and well qualified observers have argued (see *Rodriguez*, 411 U.S. at 52 n. 109, 93 S.Ct. at 1307 n. 109)—and as the Supreme Court said in *Milliken I*,

> "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. See *Wright v. Council of the City of Emporia*, 407 U.S., [451], at 469, [91 S.Ct. 2196, 2206], 33 L.Ed.2d 51 [1972]. Thus in *San Antonio School District v. Rodriguez*, 411 U.S. 1, 50, 36 L.Ed.2d 16, 93 S.Ct. 1278 [1305] (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decision-making, permits

the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'" 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069, 1089 (1974).

For the federal judiciary to take upon itself the job of limiting the degree to which local schools may be locally financed is to assume responsibility for policy decisions likely to have serious ramifications, even if the judiciary's ability to predict the nature of those ramifications is not likely to be very good. Equitable considerations ought to counsel caution here, whether constitutional considerations compel it or not.

The State of Tennessee already does, to be sure, exercise varying degrees of control over different aspects of the operation of the public schools, as authorized by a state constitutional provision declaring that "[t]he General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. There is no doubt that Tennessee could, if it wished, abolish every local school district in the state and make every school a state school pure and simple, operated directly by the state and paid for directly by the state. Tennessee has not gone that far, however; it has chosen to "provide for the maintenance, support and eligibility standards" by allowing the public schools to be operated by local school boards, subject to certain state-set standards, and to be financed primarily by local tax dollars, as supplemented by state aid in amounts determined under formulas adopted by the state legislature. Primary responsibility for funding has been delegated to the counties: "The duties of the county legislative body shall be ... to provide necessary funds to enable [the] county board [of education] to meet all obligations under the adopted budgets...." Tenn.Code Ann. § 49–2–101. The mere fact that the state legislature *may* go farther than it has in controlling and paying for the schools hardly means that the federal courts, in the exercise of their equitable powers, ought to tell the legislature what it *must* do in this respect.

The fact that desegregation programs must be paid for by one group of taxpayers or another tells us nothing as to who those taxpayers shall be, and we know of no rule of equity capable of explaining why the state legislature's judgment on such a question ought not to be respected by the federal courts. As recently as 1980, interestingly enough, the district court explained that the Metropolitan Government, the Metropolitan Mayor, and the members of the Metropolitan Council had been joined as defendants in this litigation nine years earlier "since *they* controlled the purse strings from which money for increased transportation must come." 492 F.Supp. at 172 (emphasis supplied). Now, long after *de jure* segregation has been abolished, the district court concludes that the state has a "nondelegable duty to participate" in paying the cost of local school desegregation. 615 F.Supp. at 1148. The extent of that "nondelegable" duty of fiscal "participation," it turns out, is 60%—a degree of participation for which the district court's opinion provides no rationale whatever.

To say that no more than 40% of the burden of paying for the integration of the Metro schools may be delegated to the Metro taxpayers is to voice a conclusion, not to give an intelligible reason for that conclusion. Nothing in the district court's opinion explains why the elected representatives of all the people of Tennessee should not be free to delegate to the taxpayers of each school district the burden of paying 100% of the cost of court-ordered programs designed to eliminate any vestiges of segregation in that district. In the absence of any such reason, we can only conclude that the district court abused its equitable power in ordering that Metro be indemnified for 60% of its integration costs.

Courts of equity, moreover, do not leave their doors open to prospective suitors forever. Metro and its predecessors failed to assert any claim against their parental joint tortfeasor until a decade after busing was ordered and a quarter of a century after this lawsuit was begun. We find it extremely difficult to reconcile the order appealed from with the policy considerations on which the equitable doctrine of laches is based.

Under traditional notions of equity jurisprudence, finally, equitable remedies imposed in consequence of a violation of the law may "extend no farther than required by the nature and the extent of that violation." *General Building Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982). The judicious application of this "core principle," as Justice Powell called it in *Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976) (Powell, J., concurring), is particularly important when it is proposed that the remedial powers of the federal courts be exercised "to restructure the operation of local and state governmental entities." *Hills v. Gautreaux,* 425 U.S. 284, 293, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976). "[W]here mandatory segregation by law of the races in the schools has long since ceased, [it is the duty of the courts] to first determine whether there was any action ... which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff." *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977). "[L]ocal autonomy of school districts is a vital national tradition" [citations omitted], so "the case for displacement of the local authorities by a federal court in a school desegregation case must be satisfactorily established by factual proof and justified by a reasoned statement of legal principles." *Id.* at 410, 97 S.Ct. at 2770.

Here, as in *Dayton,* "mandatory segregation by law ... has long since ceased." The district court has nonetheless displaced the judgment of the elected representatives of the people of Tennessee—displaced their judgment not on the question of whether segregation shall be permitted, but on the question of how the cost of eliminating its lingering consequences shall be defrayed. We would be hard put to explain why that "displacement" of the people's representatives is not, in substance, the judicial counterpart of a declaration of martial law. It

comes, in this case, long after hostilities have ceased, and it is "justified" by no "reasoned statement of legal principles" explaining why the imposition of mandatory segregation by past generations should deprive this generation's representatives of the power to decide for themselves how the cost of righting that great wrong shall be borne. It is simply not equitable for the court unilaterally to rearrange the tax burdens of the people of Tennessee without setting forth a principled basis for doing so.

The district court's order requiring the state to pay 60% of Metro's desegregation costs is REVERSED, and the case is REMANDED to the district court with instructions to dismiss the State, the state school board, and the state officials as third-party defendants.